## EDWARD BESSETTE

### *v.*

## THE PEOPLE OF THE STATE OF ILLINOIS.

*Opinion filed December 18, 1901.*

1. CONSTITUTIONAL LAW—*legislature has power to tax occupation of horse-shoeing for revenue purposes.* Under section 2 of article 9 of the constitution the legislature has power to pass an act requiring the occupation of horse-shoeing to be taxed, for purposes of revenue, "in such manner as may be consistent with the principles of taxation fixed in this constitution."

2. SAME—*license fee imposed by the act of 1897 is for regulation, only.* The license fee imposed by the act of 1897 on the occupation of horse-shoeing is stated by section 10 to be for the purpose of carrying out the provisions of the act and for the maintenance of the board of examiners, and hence is imposed for purposes of regulation, and not for revenue.

3. SAME—*license for regulation must be based on a proper exercise of police power.* Licenses for the regulation of occupations, and not for revenue, can only be justified upon the ground that a necessity exists for the exercise by the State, either directly or through delegation to municipal corporations, of its police power.

4. SAME—*when laws interfering with personal liberty cannot be upheld.* Laws which interfere with the personal liberty of a citizen and his right to pursue such avocation or calling as he may choose cannot be upheld unless the public health, comfort, safety or welfare demands their enactment.

5. SAME—*"liberty" embraces the right to freely follow chosen occupation.* "Liberty," as that term is used in the constitution, embraces the right of every man to be free in the use of his powers and faculties and to adopt and pursue such calling as he may choose, subject only to the restraints necessary to secure the common welfare.

6. SAME—*act of 1897, requiring horse-shoers to be licensed, is unconstitutional.* The act of 1897, which attempts to regulate the occupation of horse-shoeing by requiring horse-shoers to practice the calling for four years, submit to an examination by the board of examiners and pay a license fee for the privilege of exercising the calling, is unconstitutional.

7. SAME—*the act of 1897, relating to horse-shoers, makes an unjust discrimination.* Section 15 of the act of 1897, relating to horse-shoeing, makes the act applicable only to cities of over 50,000 inhabitants, but permits cities of over 10,000 and under 50,000 inhabitants to adopt its provisions, and hence, in effect, compels horse-shoers

residing in cities of over 50,000 inhabitants, and in cities of over 10,000 inhabitants which have adopted the act, to take out licenses, whereas those residing in cities and towns of less than 10,000 inhabitants are exempt, thus creating an arbitrary and unjust discrimination between persons engaged in the same occupation.

WRIT OF ERROR to the City Court of Aurora; the Hon. RUSSELL P. GOODWIN, Judge, presiding.

This is a prosecution, originally instituted against the plaintiff in error before a police magistrate or justice of the peace in the city of Aurora, Kane county, to recover a penalty for failure by plaintiff in error to comply with the provisions of an act entitled "An act to insure the better education of practitioners of horse-shoeing, and to regulate the practice of horse-shoers in the State of Illinois," approved June 11, 1897.

The trial before the magistrate or justice resulted in finding the plaintiff in error guilty as charged, and the imposition of a fine of $25.00, and judgment against him for such fine and costs of suit. From this judgment he prosecuted and perfected his appeal to the city court of Aurora. On the re-trial of the cause there, a jury was waived by agreement of the parties, and the cause was submitted to the court for trial. It was heard upon a written stipulation of the parties as to the facts. Such stipulation, and the ordinance hereinafter referred to, constituted all the evidence introduced on the trial. Upon the trial, counsel for plaintiff in error presented to the court a number of propositions to be held as law, calling in question the constitutionality of said act, and the effectiveness of the ordinance in question to render the said act applicable to the city of Aurora and binding upon its inhabitants. These propositions of law were all rejected and marked "refused" by the court, to which action of the court the plaintiff in error excepted.

The city court of Aurora rendered judgment, finding plaintiff in error guilty and imposing a fine of $25.00 upon

him, and rendering judgment therefor with costs of suit against him. The present appeal is prosecuted from such judgment.

The stipulation as to the facts is substantially as follows: That Edward Bessette is a citizen of Aurora; that he is by trade a horse-shoer and general blacksmith and farrier, and has been such for over five years last past, and was working at his trade of horse-shoeing at Aurora in January and February, 1898, and during that time was employed by one George A. Bulles, the owner, superintendent and foreman of the shop where Bessette worked; that, during said months, Bulles was a regular licensed horse-shoer under the statute above referred to; that, during said months of January and February, 1898, Bessette had not been examined or licensed to engage in the business of horse-shoeing by the board of examiners named in said act; that he was duly notified of the provisions of said act by the secretary of said board; that he was fined by the magistrate or justice of the peace, as above stated, for practicing as a horse-shoer in Aurora in January and February, 1898, without first obtaining a license so to do under the provisions of said act; that Aurora is a city over 10,000 and less than 50,000 inhabitants; that Bessette had been regularly engaged in the horse-shoeing business in Aurora for a period of thirteen years last past, during which he has conducted a shop of his own, and also been engaged by others in the capacity of a competent horse-shoer; that in January and February, 1898, he was employed by Bulles in his shop in . Aurora, and practiced as a journeyman horse-shoer and not as an apprentice.

Upon the trial counsel for the People offered in evidence an ordinance of the city of Aurora, passed November 15, 1897, and approved November 18, 1897, adopting the provisions of said act, and ordaining, in section 1 thereof, "that the city of Aurora, which is a city having a population of more than 10,000 inhabitants and less

than 50,000 inhabitants, hereby adopts the provisions of an act, passed by the Fortieth General Assembly of the State of Illinois, entitled 'An act to insure the better education of practitioners of horse-shoeing, and to regulate the practice of horse-shoers in the State of Illinois,' approved June 11, 1897, in force July 1, 1897, as provided for by section 15 of said act." This ordinance was objected to by counsel for plaintiff in error as not being effective to render the above entitled act applicable to Aurora and binding upon its inhabitants, but the court overruled this objection, to which action of the court exception was taken; and a certified copy of the ordinance was then read in evidence.

Section 1 of the act above referred to in regard to the practice of horse-shoers provides, "that it shall be unlawful for any person to practice as a horse-shoer in this State, unless such person shall have received a license to do so, as hereinafter provided." Section 2 of the act creates a board of examiners to consist of four practicing horse-shoers and a veterinary surgeon with the duty of carrying out the provisions of the act, the members of said board to be appointed by the Governor and to hold their offices for five years, with certain exceptions and qualifications. Section 3 provides, that the board shall choose from among its members a president, secretary and treasurer, and shall meet at least once in each year and as much oftener and at such times and places as it may deem necessary, a majority to constitute a quorum and the proceedings to be at all times open to public inspection. Section 4 of the act makes it the duty of every person, engaged as a horse-shoer in the State, to cause his or her name and residence to be registered with said board of examiners within six months after the date of the passage of the act, the board to keep a book for that purpose, and to know that the persons so registering are horse-shoers, it being provided that "every person who shall so register with said board as a horse-shoer may

continue to practice the same as such without incurring any of the penalties provided for in this act." Section 5 provides, that no person, whose name is not registered on the books of the board as a horse-shoer within said time prescribed, shall be permitted to practice as a horse-shoer in the State, until he shall have been duly examined by the board and regularly licensed in accordance with the provisions of the act. Section 6 provides, that the necessary qualification to practice as a horse-shoer in the State "shall be that the applicant has worked four years at the business of horse-shoeing and has complied with section 5 of this act." Section 7 provides that all persons so desiring may appear before said board at any of its regular meetings and be examined with reference to their knowledge and skill in horse-shoeing, and, if the examination shall prove satisfactory to the board, it shall issue to such person or persons a license to practice in the State as a horse-shoer. Section 8 provides that the secretary of the board shall issue a license, on the recommendation of two members thereof, to any applicant upon the presentation by such applicant of the evidence of the necessary qualifications to practice as a horse-shoer, and said board may provide such method of examination as it may deem wise, and such temporary license shall remain in force until the next regular meeting of the board occurring after the date of such temporary license, and no longer.

Section 9 of said act provides, that any person, who shall violate its provisions, shall be liable to prosecution, and upon conviction may be fined not less than $25.00, nor more than $200.00 for each and every offense, all fines recovered to be paid into the common school fund of the county, in which the conviction takes place. Section 10 of said act is as follows: "In order to carry out the provisions of this act and maintenance of the said board of examiners, the said board of examiners shall charge each person applying to or appearing before them

for license to practice as a horse-shoer a fee of $5.00, and for each yearly renewal thereafter $2.00, and out of the funds coming into the possession of the said board from the fees so charged, the members of said board shall receive as compensation the sum of $5.00 per diem for each and every day engaged in the discharge of the duties of their office, and all necessary expenses incurred by said board, and no part of the salary of the said board or other expense shall be paid out of the State treasury. All moneys, received in excess of said per diem allowance and other expenses above provided for, shall be held by the treasurer of said board, he giving such bond as the board from time to time shall direct, and shall not be used or expended by him except as ordered by the board, and said board shall make an annual report of its proceedings to the Governor by the 15th of December of each and every year, said report to show the names of all the horse-shoers, their places of business, and the moneys received and disbursed by them pursuant to this act."

Section 11 of the act provides that any person or persons not practical horse-shoers, desiring to engage in the business of horse-shoeing, will be permitted to do so, providing such person or persons employ as superintendent or foreman of their shoeing establishment a practical horse-shoer who has complied with section 7 of this act. Section 12 requires that any person, contracting to serve an apprenticeship at horse-shoeing, shall serve for four years, and in addition shall be required (if convenient) to attend a course of lectures each year in some institution devoted to the anatomy of the horses' feet, so that he may obtain for himself a knowledge of the same, etc. Section 13 provides that all persons, who have served the apprenticeship of four years, as above prescribed, shall, at the expiration thereof, appear before the board for examination as to skill and knowledge of horse-shoeing, and, if found competent, shall receive a license to practice horse-shoeing in this State; and that any ap-

plicant failing to pass the examination will be granted an extension of one year in which to qualify himself, and may appear before the board at any of its regular meetings for re-examination. Section 14 provides that it shall be the duty of the secretary of the board to notify all practicing horse-shoers in the State of the provisions of the act within six months after the board shall have been appointed.

Section 15, which is the last section of the act, is as follows: "This act applies only to towns and cities of 50,000 inhabitants and over, but it shall be optional with all towns and cities of 10,000 or over to come under the provisions of this act."

JOHN S. REYNOLDS, for plaintiff in error.

EDWARD C. AKIN, and FRANK W. JOSLYN, State's Attorney, (JOHN KELLY, of counsel,) for the People.

Mr. JUSTICE MAGRUDER delivered the opinion of the court:

The principal question presented by this record, which arises out of the refusal of the court below to hold as law in the decision of the case the propositions submitted by the plaintiff in error, is the constitutionality of "An act to insure the better education of practitioners of horse-shoeing, and to regulate the practice of horse-shoers in the State of Illinois," referred to and described in the statement preceding this opinion. (See Laws of Ill. of 1897, p. 233).

So much of the act, as precedes the last section, requires any person, practicing the business of horse-shoeing in Illinois, with the exception of the persons named in section 4 thereof, to work four years at the business of horse-shoeing, and to be examined by the board of examiners provided for by the act, and to obtain a license to be issued by said board to practice said business in the

State. By the terms of the act the issuance of a license by a board of five examiners, appointed by the Governor of the State, is made a condition precedent to the right of practicing the business of horse-shoeing.

It is quite apparent from the terms of the act, that it does not impose a tax upon the business of horse-shoeing. We are not inclined to hold that the legislature has no power to impose a tax upon such occupation. Section 1 of article 9 of the constitution of 1870 provides that "the General Assembly shall have power to tax peddlers, auctioneers, brokers, hawkers, merchants, commission merchants, showmen, jugglers, inn keepers, grocery keepers, liquor dealers, toll bridges, ferries, insurance, telegraph and express interests or business, vendors of patents, and persons or corporations owning or using franchises and privileges, in such manner as it shall from time to time direct by general law, uniform as to the class upon which it operates." (1 Starr & Cur. Ann. Stat.—2d ed.—p. 165.) It is true that "horse-shoers" are not mentioned in said section 1 of article 9 of the constitution, nor can they be included in any of the occupations therein named, but section 2 of said article 9 provides that "the specification of the objects and subjects of taxation shall not deprive the General Assembly of the power to require other subjects or objects to be taxed in such manner as may be consistent with the principles of taxation fixed in this constitution." (Ibid. p. 171.) Under the power granted by section 2 of article 9, a law might be passed by the legislature, requiring the occupation of horse-shoeing to be taxed in the manner therein stated. In *Howland* v. *City of Chicago*, 108 Ill. 496, it was held that, under section 2, the legislature had the power to tax the occupation of keeping a livery-stable, or to authorize cities and villages to do so, if done by general law uniform as to the class upon which it operated, although the keeping of livery-stables was not mentioned in section 1 of article 9 of the constitution among the occupations therein speci-

fied. Of course, if the act of 1897 now under considera-
tion imposed a tax upon the occupation of horse-shoeing,
such imposition would be for the purpose of revenue.

We are not prepared to say, that the legislature has
not the power to impose an exaction in the form of a
license fee for revenue upon the business of horse-shoe-
ing, even though the exaction of such license fee is not a
tax. (*Wiggins Ferry Co.* v. *City of East St. Louis,* 102 Ill. 560;
*Howland* v. *City of Chicago,* 108 id. 496; *Hawthorn* v. *People,*
109 id. 302; *Braun* v. *City of Chicago,* 110 id. 186; Cooley on
Taxation,—2d ed.—pp. 592, 595, 597, 598, 600).

The act of 1897, however, although it requires a license
to be issued, does not impose such license for the purpose
of revenue. The license fee imposed by the act must,
therefore, be imposed for regulation. Cooley in his work
on the Law of Taxation, says: "License fees may be im-
posed: (1) For regulation. (2) For revenue. (3) To give
monopolies. (4) For prohibition." (Cooley on Taxation,
—2d ed.—p. 592.) The license fee under the present act is
certainly not imposed for prohibition or to give monopo-
lies, and, as it is not imposed for revenue, its imposition
must be for the purpose of regulation.

That the license fee here under consideration is not
imposed for revenue appears from the language of the
act itself. In *Banta* v. *City of Chicago,* 172 Ill. 204, in speak-
ing of a city ordinance which required a broker to pay
a license, we said: "The language of the ordinance, or
its terms, may be expected to indicate with sufficient
precision whether the license is required for purposes of
revenue or for regulation merely, the intendment being
that regulation is the object, unless there is something
in the language indicating with sufficient certainty that
the purpose is to produce revenue." Judge Cooley also,
in his work on Taxation, says: "When a power to license
is given the intendment must be that regulation is the
object, unless there is something in the language of the
grant, or in the circumstances under which it is made,

indicating with sufficient certainty that the raising of revenue by means thereof was contemplated." (Cooley on Taxation,—2d ed.—p. 597.)

The act of 1897 in reference to horse-shoeing states, in section 10 thereof, that the license fee is charged "in order to carry out the provisions of this act and maintenance of the said board of examiners." The same section also provides that, out of the fees charged, the members of the board shall receive as compensation the sum of $5.00 per diem for each and every day engaged in the discharge of their duties, and all necessary expenses incurred by them; and also provides, that all moneys, received in excess of the per diem allowance and other expenses, shall be held by the treasurer of the board, and shall not be used or expended by him, except as ordered by the board. These provisions seem to indicate that the license fee is merely imposed for the purpose of paying the expenses of enforcing the act, and not for the purpose of raising revenue in any way. Although the act provides that, where a fine is collected upon a conviction for violating the provisions of the act, such fine shall be paid into the common school fund of the county, yet there is nothing to indicate that the license fee charged shall be appropriated as revenue for any purpose whatever.

Therefore, the proper construction of the act being that the license fee is imposed for regulation and not for revenue, the question arises whether the occupation of horse-shoeing is such an occupation as the legislature has any power to regulate in the manner provided for in this act. The general rule is, that a license fee will not be exacted for the purpose of regulating any trade, calling or occupation, unless there is something in the nature of such trade, calling or occupation, or in the circumstances surrounding it, which calls for the exercise by the State of its police power. In other words, licenses for regulation merely, and not for revenue, can only be justified upon the ground that a necessity exists for the

exercise by the State, either directly, or through delegation to municipal corporations, of its police power. The police power is limited to enactments which have reference to the public health or comfort, or to the safety or welfare of society. It has been said that "when the license is for regulation merely, * * * the question presented is, whether the business or occupation is one rendering special regulation important for any purpose of protection to the public, or to guard individuals against frauds and impositions." (Cooley on Taxation,—2d ed.— p. 600; *Hawthorn* v. *People,* 109 Ill. 302). Laws, which interfere with the personal liberty of the citizen and his right to pursue such avocation or calling as he may choose, can not be constitutionally enacted, unless the public health, comfort, safety or welfare demands their enactment. (*Ruhstrat* v. *People,* 185 Ill. 133; *Bailey* v. *People,* 190 id. 28).

Section 1 of article 2 of the constitution says: "All men are by nature free and independent, and have certain inherent and inalienable rights—among these are life, liberty, and the pursuit of happiness." Section 2 of article 2 of the constitution is as follows: "No person shall be deprived of life, liberty or property without due process of law." It has been said, that the constitutional guaranties, secured by these provisions, include the right of the citizen to follow his individual preference in the choice of an occupation. (Black on Const. Law, pp. 404, 411; *Ruhstrat* v. *People, supra.*) The general proposition, that the enjoyment by the citizen of the privilege of pursuing an ordinary calling or trade, upon terms of equality with all others in similar circumstances, is a general part of his rights of liberty and property, has been assented to by the Supreme Court of the United States. (*Powell* v. *Pennsylvania,* 127 U. S. 678.) In *Allgeyer* v. *Louisiana,* 165 U. S. 578, it was said: "The right to follow any of the common occupations of life is an inalienable right. It was formulated as such under the phrase, 'pursuit of happiness,' in the Declaration of Independence, which

commenced with the fundamental proposition, that 'all men are created equal, that they are endowed by their Creator with certain inalienable rights; that among these are life, liberty and the pursuit of happiness.' This right is a large ingredient in the civil liberty of the citizen." It was also said in the latter case, "the liberty of pursuit—the right to follow any of the ordinary callings of life—is one of the privileges of a citizen of the United States."

In *Braceville Coal Co.* v. *People*, 147 Ill. 66, we said (p. 71) that "liberty, as that term is used in the constitution, means not only freedom of the citizen from servitude and restraint, but is deemed to embrace the right of every man to be free in the use of his powers and faculties, and to adopt and pursue such avocation or calling as he may choose, subject only to the restraints necessary to secure the common welfare." ·Although the power and discretion, which the State legislature has in the matter of promoting the general welfare, and of employing means to that end, are very large, yet such power must be so exercised as not to impair the fundamental rights of life, liberty and property. And although the legislature may determine when the exigency exists for the exercise of the police power, yet it is for the courts to determine what are the subjects of the exercise of this power. It has often been said, that the exercise of legislative discretion is not subject to review by the courts, when measures adopted by the legislature are calculated to protect the public health and secure the public comfort, safety or welfare; but the measures so adopted must have some relation to the ends thus specified. (*Ritchie* v. *People*, 155 Ill. 98.) We have said: "When the police power is exerted for the purpose of regulating a useful business or occupation and the mode in which that business may be carried on, * * * the legislature is not the exclusive judge as to what is a reasonable and just restraint upon the constitutional right of the citizen to

pursue his calling, and to exercise his own judgment as to the manner of conducting it. The general right of every person to pursue any calling, and to do so in his own way, provided that he does' not encroach upon the rights of others, cannot be taken away from him by legislative enactment." (*Ruhstrat* v. *People, supra,* and authorities there referred to.) It has also been held that included in "'the right to choose one's occupation is the right to be free from unlawful interference or control in the conduct of it.'" (Ibid.; Black on Const. Law, p. 412).

An application of the principles above referred to to the provisions of this act of 1897 in relation to the business of horse-shoeing condemns it as an invalid law. It is impossible to conceive how the health, comfort, safety or welfare of society is to be promoted by requiring a horse-shoer to practice the business of horse-shoeing for four years, and submit to an examination by a board of examiners, and pay a license fee for the privilege of exercising his calling. The ends to be secured by the exercise of the police power are the public health, comfort, safety or welfare, but this measure has no relation to the ends thus specified. If this act is valid, then the legislature of the State can regulate almost any employment of the citizen by the requirement of previous study, and previous examination, and the payment of a license fee, and the issuance of a license. While we are always reluctant to put the stamp of invalidity upon any act of the legislative branch of the government, it is yet our duty, in the exercise of the trust imposed upon us by the constitution, to protect the constitutional rights and privileges of the individual citizen against such an invasion of them as is embodied in the present enactment.

Section 15 of the act, being its last section, limits its application only to towns of 50,000 inhabitants and over, although the portion of the act which precedes section 15 is so general in its terms as to include every horse-shoer in the State. While the act is by section 15 limited in

its application to towns and cities of 50,000 inhabitants and over, it yet provides that it shall be optional with towns and cities of 10,000 inhabitants or over to come under the provisions of the act. Thus, section 15 seems to divide the towns and cities of the State into three classes, one class containing 50,000 inhabitants and over, another class containing 10,000 inhabitants or over, and a third class containing less than 10,000 inhabitants. If the act can be construed as having any bearing whatever upon the municipalities known as towns and cities, it classifies them in such a way as to violate section 22 of article 4 of the constitution, which provides that "the General Assembly shall not pass local or special laws * * * incorporating cities, towns or villages, or changing or amending the charter of any town, city or village." (1 Starr & Curt. Ann. Stat.—2d ed.—p. 134). This court will take judicial notice that the general act for the incorporation of cities and villages is in force in the city of Aurora, and has been adopted by that city as its charter. (*Potwin* v. *Johnson*, 108 Ill. 70). The general Incorporation act does not confer upon cities and villages the power to regulate the business of horse-shoeing. Therefore, if the present act be construed as amending the general Incorporation act by permitting cities and villages to regulate the business of horse-shoeing, it is evidently a special law changing and amending the charter of the city of Aurora. It is true, that a classification of the cities and villages of the State by population, as a basis for legislation, may be valid, but a classification cannot be adopted arbitrarily upon a ground which has no foundation in difference of situation, or circumstances of the municipalities placed in the different classes. "There must be some reasonable relation between the situation of municipalities classified and the purposes and objects to be attained." (*People* v. *Knopf*, 183 Ill. 410; *People* v. *Martin*, 178 id. 611; *People ex rel.* v. *Cooper*, 83 id. 585).

It is difficult to see why towns or cities containing 50,000 inhabitants and over, should be subject to the requirements of the act, while cities or towns, containing less than 10,000 inhabitants, are relieved therefrom; and cities and towns, having a population exceeding 10,000 and less than 50,000, may or may not be brought within the exactions of the law according to their own option. So far as the act can be said to change or amend the charter of any city or town, it creates a purely arbitrary classification. There is no reasonable relation between the cities and towns classified in section 15 and the purposes and objects to be attained by the act in reference to horse-shoeing. (*Dupee* v. *Swigert*, 127 Ill. 494).

But it is not clear that the act can be regarded as affecting in any way the charters of cities and towns. The terms of the sections of the act, which precede section 15, do not concern cities and towns, but individuals. The legislature by the act does not delegate the power to control horse-shoeing to cities and towns, but directly itself regulates the business of horse-shoeing. In other words, the State itself acts upon the persons, engaged in the business of horse-shoeing, and does not delegate the power to regulate such business to cities and towns. It results, that section 15 can only be regarded as an arbitrary division of individuals in the State, who are engaged in the business of horse-shoeing, into three classes; first, those who live in towns or cities of 50,000 inhabitants and over; second, those who live in towns or cities having a population less than 10,000; third, those living in towns or cities having a population between 10,000 and 50,000, provided the latter choose to come under the provisions of the act. Clearly, the act unjustly and unreasonably discriminates between persons engaged in the same kind of occupation. The mere fact of the location of the individual in a particular town or city forms no basis for classification. Why should a man, pursuing the business of horse-shoeing who lives in

a city containing 50,000 inhabitants or over, be required to take out a license, while a man living in a city containing between 10,000 and 50,000 inhabitants need not take out such license, unless his city or town chooses to come under the provisions of the act, and the man who lives in a city or town, containing less than 10,000 inhabitants, is not obliged to take out any license at all?

In *Bailey* v. *People*, 190 Ill. 28, we held that "an act, which arbitrarily discriminates against one class in the transaction of a business of a lawful nature and leaves unaffected by the act other persons or classes engaged in acquiring property in a manner not distinguishable from that employed by those discriminated against, is in contravention of the constitutional guaranties respecting liberty and property." In the latter case it was held that such discrimination "is not comprehended within the true meaning of the words 'due process of law' and is prohibited by the provisions of section 22 of article 4 of the constitution of 1870." Where an act of the legislature attempted to make an employer criminally liable for discharging union employes, whereas he was not so liable for discharging a non-union employe, it was held that the act drew an unwarrantable distinction between two classes of laborers, to-wit, union laborers and non-union laborers; and it was further held, that such an act was unconstitutional as being in violation of section 22 of article 4 of the State constitution, which provides that "the General Assembly shall not pass local or special laws * * * granting to any corporation, association, or individual any special or exclusive privilege, immunity or franchise whatever." (1 Starr & Curt. Ann. Stat.—2d ed.—p. 134; *Gillespie* v. *People*, 188 Ill. 176). Where a statute does not relate to persons or things as a class, but to particular persons or things of a class, it is a special as distinguished from a general law. (Ibid.) Judge Cooley, in his work on Constitutional Limitations, (6th ed. pp. 481, 483), says: "A statute would not be con-

stitutional * * * which should select particular in-
dividuals from a class or locality, and subject them to
peculiar rules, or impose upon them special obligations
or burdens from which others in the same locality or
class are exempt. * * * Every one has a right to de-
mand that he be governed by general rules, and a special
statute which, without his consent, singles his case out
as one to be regulated by a different law from that which
is applied in all similar cases, would not be legitimate
legislation, but would be such an arbitrary mandate as
is not within the province of free governments."

In the case at bar, the act deals with one class of
workmen, to-wit, horse-shoers. It grants to horse-shoers,
living in cities and towns, containing a population less
than 10,000, and in those, containing a population be-
tween 10,000 and 50,000, a special privilege, to-wit, the
privilege of being exempt, either entirely or condition-
ally, from the obligation to take out licenses to pursue
their business, while it requires horse-shoers, living in
cities and towns containing a population of 50,000 or
over, to obtain such license. The manner, in which the
act discriminates in favor of particular persons of one
class, pursuing one occupation, and against all others of
the same class, places it in opposition to the constitu-
tional guaranties hereinbefore referred to. (*Gillespie* v.
*People, supra; Millett* v. *People,* 117 Ill. 294; *Ritchie* v. *People,*
155 id. 98; *Ruhstrat* v. *People, supra*).

The observations thus made render it unnecessary for
us to consider the question, whether the court below did
or did not err in admitting in evidence the ordinance set
forth in the statement of facts preceding this opinion.
In view of what has been said, it is immaterial whether
the act in question, if applicable to towns and cities,
could have been adopted by a town or city by ordinance,
or whether it was necessary to secure its adoption by
submitting it to a vote of the people living in such town
or city.

For the reasons herein stated, we are of the opinion that the act in question is unconstitutional. This being so, the court below erred in refusing to hold as law the propositions, submitted by the plaintiff in error, which declared it to be unconstitutional.

Accordingly, the judgment of the city court of Aurora is reversed.

*Judgment reversed.*

This case was assigned to the late Justice PHILLIPS in his lifetime, but as he prepared no opinion, the case has been re-assigned since his death.