C. HOOD DASCH ET AL. *v.* CHARLES L. JACKSON
[No. 50, January Term, 1936.]

*Decided February 20th, 1936.*

The cause was argued before BOND, C. J., URNER, OFFUTT, PARKE, SLOAN, MITCHELL, SHEHAN, and JOHNSON, JJ.

*Hilary W. Gans, Deputy Attorney General,* with whom were *Herbert R. O'Conor, Attorney General,* and *Charles T. LeViness, 3rd, Assistant Attorney General,* on the brief, for the appellants.

*William Milnes Maloy,* with whom were *Jack M. Fox* and *Maloy, Brady & Yost,* on the brief, for the appellee.

OFFUTT, J., delivered the opinion of the Court.

The General Assembly of Maryland, by chapter 377 of the Acts of 1935, for convenience herein called the act, created a board to be known as the board of examiners and supervisors of paper hangers of Baltimore City, herein called the board, consisting of five members, for "the purpose of issuing licenses and examining into the qualifications and capabilities of all persons engag-

ing in, or desiring to engage in the business of paper-hanging in Baltimore City." The board is authorized to "adopt such rules and regulations for the examination of paper-hangers as herein defined, and for the carrying on of the business of paper-hanging in such manner as to protect and promote the public health, safety and general welfare, and when so adopted, such rules and regulations shall have the same force and effect as if herein contained, and the rules of said Board shall also provide for the giving of timely notice of such meetings to all persons who shall have made application for a license as herein provided." It is also authorized, directed, and required, to "classify the business of paper-hanging into two classes, to be known as Classes A and B, and to issue a separate license for each class, upon application, examination and the payment of the fees as hereinafter provided. The holders of a Class A license shall be authorized to accept orders or contracts for paper-hanging, and to perform all such work as may be necessary for the fulfillment of such orders or contracts through the employment of holders of a Class B license, or individually, where the holder of a Class A license also holds a Class B license. The holders of a Class B license shall be authorized to hang or lay wall paper, or other similar wall coverings, prepare walls, ceiling, or other portions of buildings, and generally, to do and perform all things necessary to be done in the proper discharge of the duties of a paper-hanger." However, all persons engaged in the business of paper hanging on June 1st, 1935, were entitled to receive a license without examination if they applied for it before August 1st, 1935, and paid the license fees. The licenses are for one year, the fee for a class A (contractor's) license is fifteen dollars, and the renewal fee ten dollars, and for a class B (journeyman's) license five dollars and the renewal fee two dollars. The board is given power to revoke or suspend any license for any violation of the act or "for any other cause" which it may "deem sufficient." But before any person failing to apply before August 1st, 1935, for a license shall either continue or

carry on the business of paper hanging in Baltimore City, such person shall apply for a license, and "all such individuals, members of copartnerships and officers of employees of corporations whose duties shall engage him or her in the performance of the work usually and customarily performed by a paper-hanger, shall present himself, or herself before said Board at a time and place to be fixed by said Board for examination as to his or her qualifications to follow the occupation of a paper-hanger. Every such application shall be accompanied by the payment of a fee of Fifteen ($15.00) Dollars in cases where the application is for a Class A license, and a fee of Five ($5.00) Dollars in cases where the application is for a Class B license, and if said Board shall, upon due examination and the payment of the fee above provided, find that the person examined is qualified as a paper-hanger, then such applicant shall be entitled to a license of the Class applied for without the payment of any additional fee, which said license shall expire on the first day of May next succeeding, and be subject to renewal as hereinabove provided. A Class A license may be issued without examination, but no holder of such license shall be permitted to actually perform the work of a paper-hanger unless he also holds a Class B license, but the holder of a Class A license may carry on his business through the employment of one or more holders of a Class B license, or individually, if he hold a Class A license, but not otherwise." The act further provides that any person who shall carry on the business of paper-hanging without having first obtained a license therefor shall be subject to fine, or imprisonment, or both. It permits the holders of a Class B (journeyman's) license to employ unlicensed helpers, and also permits the owner of a building to paper it himself or to employ a Class B licensee to do the work, so that a householder may act as his own contractor and journeyman paper hanger for his own property without a license. Each member of the board is to be paid five dollars a day for his services, and its secretary such further compen-

sation as the board may allow, the compensation together with administration expenses to be paid out of license receipts, and any surplus to be paid over to the state treasurer for the use of the State.

The Governor in due course appointed as members of the board, C. Hood Dasch, Richard G. Bauer, Herman Zapf, Clement Ehoff, and Charles Block, all of whom qualified, and entered upon the administration of the duties imposed upon the board. In the course of its work it published a notice directed to "Paper-Hangers, Interior Decorators, Contracting Paper Hangers, Paper Hangers, Contracting Scrapers and Scrapers" by which they were informed that after August 31st, 1935, they would be subject to the penalties prescribed by the act unless they secured the licenses required by it.

Charles L. Jackson, the appellee, for many years has been engaged in business as an operative and contracting paper-hanger in Baltimore City, and is still in that business. But for the act he would have continued to operate it as he has done, without regulation, and without tax, except such as affected uniformly and generally all persons employed in any kind of skilled or unskilled labor. He objected to the license or tax, and he also objected to the necessity which the act imposed, of securing the consent of the board to carrying on the business which he had before carried on as a matter of common right without the consent or approval of any person, board, or agency. He asserted that, in so far as the act interfered with his right to engage in a harmless and useful employment by imposing upon him restrictions not imposed upon others employed in other forms of harmless and useful labor, it was unconstitutional and void. He therefore filed the bill in this case against the state's attorney for Baltimore City, who is charged with the duty of prosecuting violations of the statute, and against the board, for the purpose of having them enjoined from enforcing the act against him. In the bill he alleges that the act is unconstitutional because (1) it violates the Home Rule article of

the Maryland Constitution, article 11A; (2) it violates article 3, section 29 of the Maryland Constitution, relating to the titling of acts of the Legislature; (3) it violates article 3, section 33, of that Constitution because it is a "Special Act"; (4) it improperly delegates to the board legislative powers; (5) it is an improper exercise of the police power of the state, and violates the fifteenth and twenty-third articles of the Maryland Declaration of Rights and the due process clause of the Federal Constitution, Amendment 14; (6) it violates the fifteenth and twenty-third articles of the Maryland Declaration of Rights and the Fourteenth Amendment of the Federal Constitution by depriving the citizens of the equal protection of the law; and (7) it violates article 3, secs. 52 and 32, of the Maryland Constitution, Code, art. 41, secs. 117-124, in requiring license fees to be paid to the board instead of to the state treasurer.

The board and the state's attorney severally filed combined answers and demurrers to the bill. The board denied the appellee's conclusions of law, and defended the act on the ground that it had a direct relation to the public health, because, they say, the trade requires a knowledge of the elimination and destruction of germs, vermin, and pests, which can only be had from special training and experience, and also a knowledge of the properties of electricity, because the work requires the removal of electrical fixtures, and on the further ground that regulation is needed to protect the public against certain dishonest trade practices, and also to protect it against irresponsible and inefficient workmen. It further states that a substantial surplus will result from the operation of the act, which will be turned into the state treasury. The answer of the state's attorney in effect denied the conclusions of law stated in the bill, and asserted the validity of the act. Demurrers were filed to each of those answers and the case heard upon those pleadings. The court overruled the demurrers to the bill and sustained the demurrers to the answers with leave to amend. From that order, the board appealed.

The principal questions presented by the bill are (1) whether the act violates the Home Rule Amendment of the Maryland Constitution; and (2) if it does not, whether it deprives the complainant of the equal protection of the law guaranteed by the Federal Constitution; or (3) deprives him without due process of law of rights and privileges protected by both the Federal and the State Constitutions.

The City of Baltimore formed a charter under the Home Rule Amendment in November, 1918. Under the amendment and that charter, its lawmaking power is vested in the Mayor and City Council of Baltimore. Under the amendment, the Mayor and City Council are empowered to enact the local laws of that city, "upon all matters covered by" express powers granted by the General Assembly, and the General Assembly is expressly prohibited from enacting any public local law for that city on any subject covered by such express powers. Const. of Maryland, art. 11A, secs. 3 and 4. By section 2 of the article the General Assembly was directed to provide a grant of express powers for "such county or counties" as should form a charter under its provisions, and declares that neither such powers nor powers theretofore granted to the City of Baltimore, set out in the Code of Public Local Laws of Maryland, art. 4, sec. 6, should be enlarged or extended by any charter formed under the provisions of the article, but that they might be amended, extended, modified, or repealed by the General Assembly. It was assumed in *Gaither v. Jackson*, 147 Md. 655, 128 A. 769, that the grant of power to the city included all powers found in the first 222 sections of the 1915 Charter of Baltimore City, among which was the power to "license, tax and regulate all businesses, trades, avocations or professions." Code Pub. Loc. Laws, art. 4, sec. 6, subd. 14.

The question before the court in the case last cited was whether under the Home Rule Amendment the Mayor and City Council of Baltimore had the power to repeal certain sections of the Code of Public Local Laws

of Baltimore City, which provided for the appointment of auctioneers by the Governor and for the payment by the auctioneers of fees to the State, and to amend them so as to make the fees payable to the city, and to transfer the power of appointment from the Governor of the State to the Mayor of the City of Baltimore. In dealing with that question, the court, referring to the ordinances, said:

"So far as the area of their applicability is concerned, they come within the definition of local laws in *State ex rel. Webster v. County Commissioners of Baltimore County*, 29 Md. 516, 519, and in *Herbert v. County Commissioners of Baltimore County*, 97 Md. 639, 55 A. 376. * * *

"That the law sought to be repealed was intended to be a revenue law is shown both by the amount of the charge for licenses and by the imposition of duties. * * *

"If such a law can be held to be a local law within the meaning of the Home Rule Amendment, then the State has surrendered its right to impose duties or taxes under article 15 of the Bill of Rights on businesses and occupations in Baltimore City or in any county which adopts a charter under the provisions of said amendment—or retains the right subject to the will of the city or county. And this is just what the city contends the State has done as to the auction business in Baltimore City, so long as the present powers granted to the city remain unrepealed by the General Assembly, or unless such duties and taxes are made applicable to two or more geographical subdivisions of the state. We are unable to reach this conclusion. That the mere designation of a law as a local law, or its treatment as such by the General Assembly, does not make it a local law for all purposes, is illustrated in the case of *Bradshaw v. Lankford*, 73 Md. 428, 21 A. 66.

"That case can readily be distinguished in its facts from the case at bar, but there is one principal common to both cases, viz.: a law is not necessarily a local law merely because its operation is confined to Baltimore

City or to a single county, if it affects the interests of the people of the whole state."

As pointed out in that case, the effect of the Home Rule Amendment was to empower the Mayor and City Council of Baltimore to legislate as to all such matters of purely local concern as were covered by grants, prior to the amendment, found in Code Pub. Loc. Laws, art. 4, and to remove that field of legislation from the State Legislature, reserving, however, to that Legislature the right to expand or restrict that field by extending, repealing, modifying, or amending express powers theretofore granted, but denying to the city, or a county, as the case may be, the right to enlarge or extend the powers granted to it by the adoption of a charter.

By section 4 the amendment provided that any law applying to two or more of the geographical subdivisions of the state should not be deemed a local law. Apart from that limitation, it attempts no definition of the distinction between a local law and a general law, but leaves that question to be determined by the application of settled legal principles to the facts of particular cases in which the distinction may be involved.

Any complete or final definition of the term "local law" is, because of the varying meanings attached to it, considered in reference to its geographical extent and the classification of the objects to which it applies, difficult to formulate, and perhaps more difficult to apply with any proper degree of uniformity or certainty. A law may be local in the sense that it operates only within a limited area, but general in so far as it affects the rights of persons without the area to carry on a business or to do the work incident to a trade, profession, or other calling within the area. It may also be general in the sense that it affects some matter in which the people of the whole legislative jurisdiction may be interested, such as the general revenue, but local in the sense that it imposes burdens on property, business, or transactions only within a limited area.

*Gaither v. Jackson, supra,* illustrates the type of law

which, while local in its immediate operation, nevertheless is general because it affects the general revenues of the state. For the same reasons, the statute involved in *Denhard v. Baltimore*, 167 Md. 416, 173 A. 267, was held to be general in its nature. Cases cited which to some extent illustrate the type of law which, while operating only within a limited area, incidentally affects the rights and privileges of persons beyond the area, are *Bessette v. People*, 193 Ill. 334, 62 N.E. 215, which dealt with a statute regulating and licensing the business of horseshoeing, which was to be operative in municipalities of over 50,000 inhabitants, and optional in municipalities of from 10,000 to 50,000 inhabitants, and not to apply to municipalities of less than 10,000 inhabitants, and *Taylor v. City of Philadelphia*, 261 Pa. 458, 104 A. 766, where the statute under consideration authorized municipalities to provide by ordinance that all work on public buildings shall be done within municipal limits.

Confusion is caused at times from the indiscriminate use of the word "local" and "special" as though the two always meant the same thing, which of course is not so. "Local" is often used in connection with geographic or territorial limitation, while "special" is more properly used to limit or describe the subject-matter, of a law. But whether the term be given the one meaning or the other, it clearly excludes the statute under consideration in this case from the field of legislation over which the City of Baltimore is given exclusive control by the Home Rule Amendment. First, because it imposes taxes or fees designed to produce a surplus payable into the general funds of the State (*Gaither v. Jackson, supra*), and to that extent affects to some extent the people of the whole State. Second, because it affects the right of persons not residing in the City of Baltimore as well as the right of persons residing within that city to engage in the business of paper hanging in Baltimore City, either as contractors or journeymen. It is not therefore a local law within the meaning of the Home Rule Amendment, but is within the field of legislation over which the General Assembly of the State retains control.

The second and third questions may be considered together, because if the law operates to deprive the appellee of the equal protection of the law by burdening his right to carry on his business with conditions and exactions not imposed upon others engaged in work of the same general character, it may also operate to deprive him of his property without due process of law, for such a right is property. *Cooley, Constitutional Limitations* (8th Ed.) p. 748; *Wight v. Balto. & O. R. Co.,* 146 Md. 66, 125 A. 881.

It is a recognized principle of American constitutional law that every man has the right to labor, to contract, to hold property, and in his own way to pursue happiness. That is liberty. It is implicit in the Declaration of Independence, in the Federal Constitution, and in the constitutions of the several states. The term, however, is relative and not absolute. There is no such thing, either in nature or in organized society, as absolute freedom of conduct and action. In man's natural state his conduct is always subject to restraint by superior force. In organized society it must of necessity be subject to restraints which confine it within limits essential to the happiness and safety of the whole body of the people of that society. In organized society, restraint is correlative with privilege and opportunity. As society advances from a primitive to a more complex and highly organized state, it is accompanied by circumstances which give to the individual increasing security and wider opportunities of happiness and well-being, which are of necessity bought by the surrender of some part of the freedom of action which the individual apart from artificial laws might have. Liberty, therefore, is associated with force and coercion, for in order that all may enjoy security and a rational measure of opportunity of happiness and security, the acts of individuals inconsistent with that end must be restrained. So that, as through the increasing complexity of social organization privileges and immunities which afford opportunities for the common welfare and happiness increase, the freedom of the individual to act without regard to the effect of

his acts upon others decreases in much the same ratio. *Cooley, Const.Lim.* (8th Ed.) 824.

When, therefore, the application of such guarantees as are found in the Fifth and Fourteenth Amendments of the Federal Constitution, and in article 23 of the Maryland Declaration of Rights, is considered, it must be with due regard to the principle that the State, in the exercise of what is usually called its police power, may regulate or restrict the freedom of the individual to act, when such regulation or restraint is essential to the protection of the public safety, health, or morals. That power, however, is itself subject to the restraints imposed by constitutions which the whole people have adopted and approved as the supreme law of the land. 12 *C. J.* 928, 929; *State v. Hyman,* 98 Md. 596, 57 A. 6; *American Coal Co. v. Allegany County,* 128 Md. 564, 98 A. 143; *Goldman v. Crowther,* 147 Md. 282, 295, 128 A. 50; *Tighe v. Osborne,* 149 Md. 349, 356, 131 A. 801; *State v. Gurry,* 121 Md. 534, 88 A. 546.

So that, while the legislature may, in the proper exercise of the State's police power, classify the persons to whom a prescribed regulation found to be necessary to the public welfare may apply (*Ruggles v. State,* 120 Md. 553, 561, 87 A. 1080, *American Coal Co. v. Allegany County, supra*), or determine whether certain classes of acts may be regulated (*Chesapeake & Potomac Tel. Co. v. State Board of Forestry,* 125 Md. 666, 673, 94 A. 322), nevertheless the exercise of the power must have some real and substantial relation to the public welfare (12 *C.J.* 929-931, *Goldman v. Crowther, supra*), and the legislature may not, under the cloak of the police power, exercise a power forbidden by the Constitution (*State v. Hyman, supra*), or take away rights and privileges expressly guaranteed by it.

Among those privileges are these: That the individual shall not be deprived of his life, liberty, or property without due process of law; and that the individual is entitled to the equal protection of the law.

Property, within the meaning of that guarantee, in-

cludes the right to engage in those common occupations or callings which involve no threat to the public welfare, to exercise a choice in the selection of an occupation, and to pursue that occupation in his own way so long as he does not interfere with the rights of others. *Bessette v. People, supra; Allgeyer v. Louisiana,* 165 U.S. 578, 17 S.Ct. 427, 41 L. Ed. 832; *Cooley, Const.Lim.* (8th Ed.) 747, note 1; *Wight v. Baltimore & O. R. Co., supra.*

And while the right of the legislature to regulate a business, trade, or occupation, where such regulation is required for the protection of the public health, safety, or morals (12 *C.J., Constitutional Law,* secs. 425-442; *Keller v. State,* 122 Md. 677, 684, 90 A. 603; *Singer v. State,* 72 Md. 464, 19 A. 1044; *Ruggles v. State,* 120 Md. 553, 87 A. 1080; *Maryland State Funeral Directors' Assn. v. State Board of Undertakers,* 150 Md. 294, 133 A. 62), or to impose a tax thereon, is settled (*Cooley, Const.Lim.* (8th Ed.) 1044; 12 *C.J.* 1155; *Ruggles v. State, supra*), it may not exercise that power arbitrarily or capriciously, or in such a manner as to deprive the individual of rights, privileges, immunities, or property to which he is entitled as a matter of natural justice and common usage, except for the protection of some real and substantial public interest. *Willoughby on the Constitution,* 1233. Nor, even where the object upon which the law operates is within its range, can it be exerted in such a manner as to impose upon members of a selected class burdens which are not shared by others in like circumstances. For those "who make the law" are to govern by promulgated, established laws, not to be varied in particular cases, but to have one rule for rich and poor, "for the favorite at court and the countryman at plough." *Locke on Civil Government,* sec. 142; *Cooley, Const. Lim.* 810. "Equality of rights, privileges, and capacities unquestionably should be the aim of the law; and if special privileges are granted, or special burdens or restrictions imposed in any case, it must be presumed that the legislature designed to depart as little as possible from this fundamental maxim of govern-

ment." *Cooley, Const. Lim.* 813. In *Connolly v. Union Sewer Pipe Co.,* 184 U.S. 540, 22 S.Ct. 431, 439, 46 L.Ed. 679, it was said: "The difficulty is not met by saying that, generally speaking, the state when enacting laws may, in its discretion, make a classification of persons, firms, corporations, and associations, in order to subserve public objects. For this court has held that classification 'must always rest upon some difference which bears a reasonable and just relation to the act in respect to which the classification is proposed, and can never be made arbitrarily and without any such basis. * * * But arbitrary selection can never be justified by calling it classification. The equal protection demanded by the Fourteenth Amendment forbids this. * * * No duty rests more imperatively upon the courts than the enforcement of those constitutional provisions intended to secure that equality of rights which is the foundation of free government. * * * It is apparent that the mere fact of classification is not sufficient to relieve a statute from the reach of the equality clause of the Fourteenth Amendment, and that in all cases it must appear, not only that a classification has been made, but also that it is one based upon some reasonable ground,—some difference which bears a just and proper relation to the attempted classification,—and is not a mere arbitrary selection'."

So, while the state has the power, for purposes of taxation, or for the legitimate protection or promotion of some substantial public interest, to classify the objects upon which the power is exercised, the classification must have some rational basis, and the operation of the law upon persons or property within the class must be uniform and equal. 12 *C.J.* 1159, 1274, 1128 *et seq.,* 1136; 6 *R.C.L.* 218, 369, 373.

Cases illustrating the proper exercise of the power are *Singer v. State,* 72 Md. 464, 19 A. 1044, where a statute providing that no person should engage in the business of plumbing in Baltimore City without having first obtained a certificate of his competency and qualifi-

cations was upheld; *Scholle v. State*, 90 Md. 729, 46 A. 326, where a like conclusion was reached as to a statute regulating the practice of medicine or dentistry; *State v. Knowles*, 90 Md. 646, 45 A. 877; *State v. Loden*, 117 Md. 373, 378, 83 A. 564, where a statute regulating the motion picture business was upheld; *Clark v. Harford Agricultural & Breeders' Assn.*, 118 Md. 608, 85 A. 503, where a statute regulating horse racing was sustained; *Gregg v. Public Service Commission*, 121 Md. 1, 87 A. 1111, where a statute for the regulation of public utilities was upheld; and *Keller v. State*, 122 Md. 677, 90 A. 603, where the court sustained the right of the Legislature to regulate the undertaking business.

Cases illustrating the improper exercise of the power are *Luman v. Hitchens Bros. Co.*, 90 Md. 14, 44 A. 1051, where the court struck down a statute prohibiting certain corporations, their officers and agents, from bartering goods, wares, or merchandise to their employees; *Long v. State*, 74 Md. 565, 22 A. 4, where a statute prohibiting gift enterprises was held invalid; *Kelman v. Ryan*, 163 Md. 519, 163 A. 593, where a statute excepting food supplies for household use from Code, art. 9, sec. 33, was held invalid; and cases collected 6 *R.C.L.* 218, notes 17-19.

Perhaps the farthest point reached by the tide of regulation of labor and industry is marked by the Barbers' Act, which was before this court in *State v. Tag*, 100 Md. 588, 60 A. 465, and *Criswell v. State*, 126 Md. 103, 94 A. 549, and upheld. While that occupation may have some conceivable relation to the public health (*State v. Armeno*, 29 R.I. 431, 72 A. 216), there is much force in the statement found in *Timmons v. Morris* .(D.C.) 271 Fed. 721, 724, that "The court is convinced that, in so far as the practice of barbering is concerned, the public welfare and comfort—outside of, and beyond what is included in its health and safety—are so insignificant as not to lend color to any right claimed under the police power of the state." Statutes regulating plumbing also bear a perceptible relation to the public health and

safety, since persons following that occupation are required to provide for the confinement and transmission of highly noxious and explosive gases, to install devices and instrumentalities for the effective sanitation of public and private property, and to provide for the conduct of water and steam at high pressures through safe channels and conduits; although the cases are by no means harmonious upon the question as to whether the police power of a state is broad enough to even permit it to require plumbers to secure licenses. *Replogle v. City of Little Rock,* 166 Ark. 617, 267 S.W. 353. The reasons for a contrary view are very forcibly stated in a dissenting opinion by Justice Peckham in *People ex rel. Nechamcus v. Warden of City Prison,* 144 N.Y. 529, 39 N.E. 686, 690, adopted in *Replogle v. City of Little Rock,* 166 Ark. 617, 267 S.W. 353, 355, in which he said: "But the trade of the practical plumber is not one of the learned professions, nor does such a tradesman hold himself out in any manner as an expert in the science of 'sanitation,' nor is any such knowledge expected of him, and this act, when practically enforced, may or may not exact it of him. This board has the very greatest and entirely arbitrary discretion as to what qualifications it will exact from the applicant. It may make an examination which none but an expert in sanitary knowledge could pass, or it may make the examination entirely perfunctory. * * * If it is intended as an act simply to secure the ordinary capacity necessary for the prosecution of the trade of a plumber, it is useless and vexatious, and not a health regulation in any form. If it exact more, it is an improper addition to the qualifications of a simple tradesman." In support of that view, the court, in *Replogle v. City of Little Rock, supra,* used the following quotations: " 'It is an important part of civil liberty to have the right to follow all lawful employment.' *Cooley on Torts,* 277. Mr. Tiedeman says: 'No man's liberty is safe if the Legislature can deny him the right to engage in a harmless calling.' 1 *Tiedeman on State and Federal Control of Persons and Property,* 236.

Mr. Justice Bradley, speaking for the United States Supreme Court in *Butchers' Union S. H. & L. S. L. Co. v. Crescent City L. S. L. & S. H. Co.,* 111 U.S. 746, 4 S.Ct. 652, 28 L.Ed. 585, says: 'The right to follow any of the common occupations of life is an inalienable right. * * * The right to follow any of the ordinary callings of life is one of the privileges of a citizen of the United States'." See, also, *Bessette v. People, supra; Baker v. Daly* (D.C.) 15 Fed. (2nd) 881.

From these, and the countless other cases in which the right of the state to regulate occupations was involved, this general principle emerges with some degree of certainty, that the state may for purposes of revenue tax any occupation or business, but that, except for revenue, it may not annex any burdensome conditions on the common callings of life or the right of the individual to engage therein, unless such regulation is required for the protection of the public health, safety, or morals, and that where justified on that ground any classification, adopted for the purposes of the regulatory measure, must be reasonable, uniform in its operation within the class, and based upon some legitimate principle of public policy.

Measured by that standard, the act under consideration cannot be sustained as a valid exercise of legislative authority.

The art of paper hanging is one that requires manual dexterity, skill, and some experience. It differs in that respect not at all from other similar occupations, such as house painting, carpentry, stone cutting, bricklaying, horseshoeing, repairing machinery, wood carving, plastering, and the like, which men have from time immemorial followed without regulation or interference, as a matter of common right, and which have no substantial relation to the public health or safety.

Under the act, the board is authorized to adopt rules and regulations for the examination of paper hangers and for the carrying on of the business of paper hanging in such a manner "as to promote the public health, safety

and the general welfare." It might therefore require that a paper hanger show that he had acquired the proficiency in the science of bacteriology, chemistry, sanitation, and hygiene, which might be required to enable him to take such measures as would leave his completed work sterile and aseptic. Any such requirement would be palpably absurd, for a paper hanger is neither employed nor thought of as a sanitary engineer, but as one engaged in a useful and harmless art, requiring skill, taste, knowledge of the materials needed, and of the proper manner of utilizing them, and nothing more. To compel him to acquire at the expense of money and time knowledge and experience which would be wholly useless in his business would be an unjust and unreasonable burden. On the other hand, if that knowledge and experience is not required of him, there is no possible justification for the regulation of the paper hanger's trade or vocation, on the ground that such regulation is necessary to the protection of the public health or safety, any more than there would be for regulating the business of a carpenter or a bricklayer, or any other harmless and useful calling. It would, indeed, be impossible to imagine any occupation, no matter how harmless or common, which is not attended by some danger. The prick of a needle, the scratch of a pin, a bit of ice on the sidewalk, a misplaced chair, contact with some common electrical appliance, may cause suffering or death, but such perils are too remote, and their causes so much a part of everyday life that if they afforded a basis for regulating the activities of men, the promise of the right to liberty and the pursuit of happiness held out by the Constitution would be an ironical mockery. There must of necessity be somewhere a limit to the right of the state to regulate the common useful and harmless activities of life, beyond which the state may not go without destroying those guarantees, and this statute has passed that limit.

Nor, apart from any other consideration, is there any rational basis for the territorial classification made by

the act, for there is no such difference in the conditions existing within the state outside of Baltimore City and those within its limits, in reference to the business of paper hanging, which would make the pursuit of it in the city a menace to the public health and safety but harmless beyond its limits. It is, of course, well settled that the legislature may restrict the application of statutes to localities less in extent than the state (*State ex rel. Webster v. County Commissioners of Baltimore County*, 29 Md. 516, 519), as the exigencies of the several parts of the state may require. But broad as that power is, it may not be used to deprive the citizen of one part of the state of rights and privileges which they enjoy in common with the citizens of all other parts of the state, unless there is some difference in conditions in the territory selected and that not affected by the statute, sufficient to afford some basis, however slight, for the classification.

It follows that, for the reasons stated, the act violates article 23 of the Maryland Declaration of Rights and the Fourteenth Amendment of the Constitution of the United States, and is therefore void. For that reason, it becomes unnecessary to consider the other objections urged to it, and the decree appealed from will be affirmed.

*Decree affirmed, with costs.*