## ATTORNEY GENERAL OF MARYLAND et al. v. RICHARD V. WALDRON

[No. 45, September Term, 1980.]

*Decided March 13, 1981.*

The cause was argued before MURPHY, C. J., and SMITH, DIGGES, ELDRIDGE, COLE, DAVIDSON and RODOWSKY, JJ.

*Alfred L. Scanlan, Jr., Assistant Attorney General,* with whom was *George A. Nilson, Deputy Attorney General,* on the brief, for appellants.

*Richard V. Waldron,* in proper person, appellee.

DIGGES, J., delivered the opinion of the Court.

With this case, we shall answer questions once before raised in but not reached by this Court. Specifically, we determine: (i) whether section 56 (c) of Article 73B,[1] which prohibits the practice of law for compensation by certain members of the Maryland Bar who have previously held a judicial office, violates the principle of separation of powers embodied in Article 8 of the Maryland Declaration of Rights; and (ii) whether this same enactment breaches the fundamental principles of equal protection embodied in our State and federal organic laws. As this action raises by implication fundamental issues concerning the proper repository for, and particular limitations on, a large part of the constitutional authority to regulate the legal profession, we shall here provide a full exposition of our thoughts on the matters after initially supplying the necessary factual backdrop to the case.[2]

## I

### Factual Background

Because the questions here stated present purely legal issues, the facts involved are important only insofar as necessary for a full percipience of the parties' respective positions. As we have previously explained, see *Chairman of Board v. Waldron,* 285 Md. 175, 401 A.2d 172 (1979)

---

1. The reference here is to Md. Code (1957, 1978 Repl. Vol.).

2. Despite the potential collateral interest that each of us may have in the outcome of this litigation, we recognized in Chairman of Board v. Waldron, 285 Md. 175, 179-80, 401 A.2d 172, 174-75 (1979) (predecessor of the case before us), as we again do here, that since disqualification of all the judges would destroy all forums for judicial review, both initial and appellate, we must of necessity decide these delicate issues. We note that subsequent to our observation in *Waldron I,* the Supreme Court of the United States, faced with a decision concerning the validity of judicial pay legislation, invoked this "rule of necessity" and adjudicated the issues before it. United States v. Will, U.S., 101 S. Ct. 471, 480, 66 L. Ed. 2d 392 (1980).

(*Waldron I*), the respondent in this case was a judge of the District Court of Maryland sitting in Prince George's County (and its predecessor, the People's Court), who, having not received reappointment following ten years of service on the bench, retired in August of 1977. Desiring to return to the practice of law in this State as well as in the District of Columbia, while perceiving a statutory obstacle to his receipt of pension benefits under Md. Code, Art. 73B, § 57 if he did so, Waldron initiated a frontal assault on the apparent legislative impediment. Thus, the former judge sought in *Waldron I,* from the Circuit Court for Calvert County, a declaration that section 56 (c) of Article 73B, his perceived antagonist, unconstitutionally infringed his rights to due process and equal protection of the law under both the State and federal constitutions and that the provision invaded the province of the judicial branch in violation of this State's basic constitutional principle of separation of powers. Judge Waldron succeeded in the trial court on the equal protection claim. This Court, however, there construed section 56 (c) as creating a prohibition whose violation would constitute the unauthorized practice of law, and not one establishing preconditions to the receipt of pension benefits as we noted that section 56 (c)'s predecessor did. *Chairman of Board v. Waldron, supra* at 180, 401 A.2d at 175. Thus, since none of those designated to police the unauthorized practice of law were named in the prior suit, see Md. Code (1957, 1981 Repl. Vol.), Art. 10, § 26A, we were compelled to vacate the trial court's determination for failure to join parties necessary to adjudicate the questions raised, and consequently did not address the constitutional issues there posed for our review. *Id.* at 180, 401 A.2d at 175.

These issues, however, have again found their way before this Court. When Judge Waldron began the practice of law for compensation after our decision in *Waldron I,* the Attorney General, acting pursuant to the enforcement authority with regard to unauthorized practice vested in him by section 26A of Article 10, docketed an equity suit in the Circuit Court for Prince George's County seeking, first, to enjoin the respondent from the practice of law while receiving his pen-

sion, and second, a declaration that section 56 (c) is constitutional in all respects.[3] The trial court (Bowen, J.) did not grant this relief. Instead, it declared the contested statutory provision to be contrary to both the principle of separation of powers found in Article 8 of the Maryland Declaration of Rights and the guaranties of equal protection of the law under both the federal and State constitutions. Prior to consideration of the matter by the intermediate appellate court, we issued our writ of certiorari to enable us to pass upon the important issues raised by this enduring litigation.

## II

### Separation of Powers

The initial contention of the Attorney General before this Court is that the Circuit Court for Prince George's County erred when it concluded section 56 (c) of Article 73B of the Maryland Code unconstitutionally "invades the exclusive power of the judiciary to determine who may practice law and, therefore, violates the separation of powers principle." The contested section 56 (c) provides:

A judge who retires and accepts the pension provided by this subtitle may not, thereafter, engage in the practice of law for compensation; but this prohibition does not apply to a former judge who has attained the age of 70 years and received less than $3500 per annum in pension as provided by this

---

**3.** The Attorney General on behalf of the State Retirement System also filed a law action for reimbursement of pension funds paid to former Judge Waldron while practicing law in Maryland in violation, according to the State, of § 56 (c). In light of this Court's determination in *Waldron I* that there are no preconditions to receipt of the judicial pension and that this is a fully vested grant, we are unable to fathom the theory upon which the State anticipates recovery of these pension payments. In any event, the law action has apparently been stayed pending resolution of this appeal.

In addition to the Attorney General, joined as complainants in the present action now before us are the Employee's Retirement System of the State of Maryland and the Chairman of its Board of Trustees. Throughout this opinion, however, we shall refer to the appellants collectively in the singular or only as the Attorney General.

subtitle, and who has not voluntarily retired. [Md. Code (1957, 1978 Repl. Vol.), Art. 73B, § 56 (c).]

The trial judge correctly characterized this provision as one that, "by depriving a person who has been admitted to practice of his right to do so unless he meets further conditions," regulates the practice of law. This observation is consistent with our construction in *Chairman of Board v. Waldron,* 285 Md. 175, 180, 401 A.2d 172, 175 (1979), that section 56 (c) "is a direct command to a retired judge who accepts a pension that he 'may not, thereafter, engage in the practice of law for compensation.'" Thus, it is clear that the enactment now before us manifests an undertaking on the part of the General Assembly to regulate the legal profession by prescribing for certain otherwise qualified practitioners additional prerequisites to the continued pursuit of their chosen vocation. We turn, therefore, to consider whether such regulation by the legislative branch of our government is permissible under the constitution of this State.[4]

The concept that the rights and liberties cherished by the people of Maryland are best safeguarded by the division of governmental powers into independent and coequal organs is familiar to even a casual student of our constitutional heritage. Although this doctrine is both fundamental to our scheme of government and well known, we believe it important to recall that the "purpose [of separating the exercise of the sovereign powers] was, not to avoid friction, but, by means of the inevitable friction incident to the distribution of the governmental powers among three departments, to save the people from autocracy." *Myers v. United States,* 272 U.S. 52, 293, 47 S. Ct. 21, 84, 71 L. Ed. 160 (1926) (Brandeis, J., dissenting). The doctrine of separation of powers was thought by the founding fathers of this State to be of such

---

4. We point out that we are here not faced with a statute which, as § 56 (c)'s predecessor § 55 (e) did, conditions the receipt of a judicial pension on specified requisites; of course, an enactment providing as this former statute did would not pose the Article 8 separation of powers problem presented by this case. See Md. Code (1957, 1970 Repl. Vol., 1973 Cum. Supp., 1973 Add. Supp.), Art. 73B, § 55 (e) (repealed by 1974 Laws of Maryland, ch. 483, § 1).

monumental importance for the continued safekeeping of our freedoms that they specifically incorporated this tenet into the proposed initial Declaration of Rights, thereafter adopted as part of the Maryland Constitution of 1776. See Maryland Declaration of Rights of 1776, Art. 6. Since that time the expression of this concept has always had a place in our organic law, although its written locution has varied in our later constitutions, so that Article 8 of the present document reads: "That the Legislative, Executive and Judicial powers of Government ought to be forever separate and distinct from each other; and no person exercising the functions of one of said Departments shall assume or discharge the duties of any other."[5] This provision has been consistently interpreted from its inception

> to parcel out and separate the powers of government, and to confide particular classes of them to particular branches of the supreme authority. That is to say, such of them as are judicial in their character to the judiciary; such as are legislative to the legislative, and such as are executive in their nature to the executive. Within the particular limits assigned to each, they are supreme and uncontrollable. [*Wright v. Wright,* 2 Md. 429, 452 (1852).]

More recently, this Court has iterated that while "the separation of powers concept may constitutionally encompass a sensible degree of elasticity ... [Article 8] cannot be stretched to a point where, in effect, there no longer exists a separation of governmental power." *Dep't of Nat. Res. v. Linchester,* 274 Md. 211, 220, 334 A.2d 514, 521 (1975). Though the precise delineation of authority between the three basic organs of our tripartite government is at times difficult to discern, when an issue arises, we must nevertheless determine such demarcations, for, as we went on to say in *Linchester:*

---

5. The verbiage contained in the 1776 Constitution remained unaltered until the adoption of the Constitution of 1851, when the endmost clause was affixed.

When the Legislature confers, by enactment, powers upon one of the other branches of government which are beyond those permitted under the Constitution, or any of the three branches of government takes unto itself powers denied to it or those strictly within the sovereignty of another branch, the courts of this State must step in and declare such encroachments to be constitutionally prohibited, not because the court is a "Triton among minnows" or predominates in dignity, but because, as Chief Justice Marshall, in *Marbury v. Madison,* 1 Cranch 137, 2 L. Ed. 60 (1803) . . . avowed: "It is emphatically the province and duty of the judicial department to say what the law is." [*Dep't of Nat. Res. v. Linchester, supra,* 274 Md. at 220-21, 334 A.2d at 521 (1975). See also *Perkins v. Eskridge,* 278 Md. 619, 624-27, 366 A.2d 21, 26-27 (1976); *Whittington v. Polk,* 1 H & J 236, 242-46 (1802) (case predating *Marbury* espousing identical view in relation to this State's judiciary).]

We have recognized in the past that, in addition to the specific powers and functions expressly granted to the three organs of government by the Constitution, each branch possesses additional powers perforce implied from the right and obligation to perform its constitutional duties. *E.g., Dep't of Nat. Res. v. Linchester, supra,* 274 Md. at 223, 334 A.2d at 522-23; *Maryland St. Bar Ass'n v. Agnew,* 271 Md. 543, 546, 318 A.2d 811, 813 (1974); *Maryland St. Bar Ass'n v. Boone,* 255 Md. 420, 429-32, 258 A.2d 438, 443-44 (1969); *Pub. Serv. Comm'n v. Hahn Transp., Inc.,* 253 Md. 571, 583, 253 A.2d 845, 852 (1969); *Deems v. Western Maryland Ry.,* 247 Md. 95, 101-02, 231 A.2d 514, 517-18 (1967); *Stevens v. City of Salisbury,* 240 Md. 556, 563-64, 214 A.2d 775, 779 (1965). Indeed, the existence of such powers inheres in the scheme of a written constitution, for without this authority, the document would, by necessity, be but a tome exhaustively cataloging the sole authority of the respective political institutions. Particularly important for the resolution of this case, of course, is what has come to be known as the inci-

dental, implied or inherent power of one branch of government — the judiciary — and its relation to the police power vested, albeit inherently, in the legislative branch.[6] Discussing the power that inheres in the judiciary in a democracy structured as ours, the Supreme Court of Wisconsin, over fifty years ago, lucidly articulated the foundation of such authority:

> In order to accomplish the purposes for which they are created, courts must also possess powers. From time immemorial, certain powers have been conceded to courts, because they are courts. Such powers have been conceded, because without them they could neither maintain their dignity, transact their business, nor accomplish the purposes of their existence. * * * "The inherent power of the court is the power to protect itself; the power to administer justice. . .; the power to promulgate rules for its practice; and the power to provide process where none exists. It is true that the judicial power of this court was created by the Constitution, but, upon coming into being under the Constitution, this court came into being with inherent powers." [*State v. Cannon,* 196 Wis. 534, 221 N.W. 603, 603-04 (1928) (quoting *In re Bruen,* 102 Wash. 472, 172 P. 1152 (1918).]

---

6. Whether this· power vested in the judiciary is characterized as "implied" from the constitutional grant of judicial power and obligation to perform the judicial function, or "inherent" in the court by its existence independent of any affirmative power expressly conferred by the constitution, results in no practical difference in the division of governmental powers or in the rights enjoyed by the people. As was accurately explained by the highest court of Wisconsin in State v. Cannon:

The controversy seems to be [one] over names and not powers. . . . [W]hen the power is conceded the matter of its proper designation may afford an intriguing subject for mental sparring; but whether it be called implied or inherent results in no substantial difference to the citizen. . . . No one entertains the thought, whether it be called inherent or implied, that it is a power which transcends the Constitution. It is a power which may be taken away by the Constitution, just as all courts may be abolished by the Constitution. . . . [W]hether it be called implied or inherent is quite immaterial, except to those having a refined instinct for exactitude of expression. [206 Wis. 374, 240 N.W. 441, 449 (1932), *disapproved*

Cognizant of the constitutionally imposed responsibility with respect to the administration of justice in this State, this Court has heretofore recognized and held that the regulation of the practice of law, the admittance of new members to the bar, and the discipline of attorneys who fail to conform to the established standards governing their professional conduct are essentially judicial in nature and, accordingly, are encompassed in the constitutional grant of judicial authority to the courts of this State. *Attorney Grievance Comm'n v. Reamer,* 281 Md. 323, 331, 379 A.2d 171, 176 (1977); *Attorney Griev. Comm'n v. Andresen,* 281 Md. 152, 159, 379 A.2d 159, 163 (1977); *Maryland St. Bar Ass'n v. Agnew, supra,* 271 Md. at 546, 318 A.2d at 813; *In re Diener and Broccolino,* 268 Md. 659, 685, 304 A.2d 587, 601 (1973), *cert. denied, Broccolino v. Maryland Comm. on Judicial Disabilities,* 415 U.S. 989 (1974); *Maryland St. Bar Ass'n v. Boone, supra,* 255 Md. 420, 430-32, 258 A.2d 438, 443-44 (1969); *Pub. Serv. Comm'n v. Hahn Transp., Inc., supra,* 253 Md. at 583, 253 A.2d at 852. See *Attorney Griev. Comm'n v. Klauber,* 283 Md. 597, 603, 391 A.2d 849, 852 (1978) (concurring opinion by Gilbert, J.). Thus, in *Hahn,* 253 Md. at 583, 253 A.2d at 852, Chief Judge Hammond stated for this Court that "[u]nder our constitutional system of separation of powers, the determination of what constitutes the practice of law and the regulation of the practice and of its practitioners is, and essentially and appropriately should be, a function of the judicial branch of government." A short time later, this Court determined, *inter alia,* that the following words of the Supreme Judicial Court of Massachusetts are "highly persuasive":

> It is a necessary implication from the exclusive jurisdiction of the judicial department of control of membership in the bar that the judicial department is not restricted in the [manner] of review in such

*on other grounds,* State v. Dinger, 19 Wis. 2d 193, 109 N.W.2d 685 (1961).]

We would only add that the abolition of the judiciary en masse would pose an interesting, though highly academic, question in light of the several federal constitutional guaranties.

proceedings to methods prescribed by statute. If this were not true the judicial department would be restricted by legislative action in the performance of its duties with respect to membership in the bar of which it has "exclusive cognizance." [*Maryland State Bar Ass'n v. Boone,* 255 Md. at 431, 258 A.2d at 443.]

The principle that the admission of attorneys to the bar as well as their supervision once admitted are by nature functions and concerns of the judicial branch of government is far from a novel concept. The history of the courts in the formative years of this nation, and indeed, the history of our ancestral English courts support the conclusion that this uniquely judicial responsibility is of ancient vintage. Even though the doctrine of separation of powers is not an integral part of the British system of government and is one whose fruition occurred on the western shores of the Atlantic, the English courts — common law, chancery, admiralty and ecclesiastical — have always exclusively admitted attorneys, solicitors and proctors to practice before them. Insofar as the other class of English legal practitioners is concerned, barristers traditionally were regulated by the educational societies known as the Inns of Court, which, in turn, generally are thought to have submitted to the control of judges as visitors to those bodies. All of this oversight and supervision of the English practitioners was accomplished independent of any authorization or predomination by any other department of government. See *State v. Cannon,* 206 Wis. 589, 240 N.W. 441, 445-48 (1932), and *In re Day,* 181 Ill. 73, 54 N.E. 646, 648-50 (1899), and citations therein, for discussions of the history of the admission and regulation of lawyers in England. *See also* Note, *Admission to the Bar and the Separation of Powers,* 7 Utah L. Rev. 82, 82-86 (1960). Similarly, there are early statements in opinions of courts of this country that declare the admission to practice to be an exercise of judicial power. *See, e.g., Ex parte Garland,* 71 U.S. (4 Wall) 333, 18 L. Ed. 366 (1867); *Ex parte Secombe,* 60 U.S. (19 How.) 9, 15 L. Ed. 565 (1857); *In re Mosness,* 39

Wis. 509, 20 Am. Rep. 55, 56-57 (1876). *See also* 1 E. Thornton, *Attorneys at Law* §§ 756-61 (1914). As has been recognized by a distinguished scholar of these matters:

> It is undoubtedly true that the power to admit one to practice as an attorney at law is a judicial function. It is a power inherent in the court, which is to be exercised by a sound judicial discretion. . . . Early in the national jurisprudence it was held that the power to admit and remove was the exclusive province of a federal court. And this ruling has been consistently maintained. Where a state constitution lodges the judicial power exclusively in the courts, as a coordinate department of government, [as does Maryland's by Art. IV, § 1,] the legislature will not be permitted to encroach upon the judicial powers by assuming to make admission to the bar a legislative function. [Id., § 28, p. 31-32.]

Moreover, in more recent decades, various courts from many of our sister jurisdictions have pronounced that such authority, and the power generally to regulate matters regarding the profession and its practitioners, are reposed inherently in the judiciary. *Application of Houston,* 378 P.2d 644, 645 (Alaska 1963); *Brydonjack v. State Bar,* 208 Cal. 439, 281 P. 1018, 1020 (1929); *Denver Bar Association v. Public Utilities Commission,* 154 Colo. 273, 391 P.2d 467, 470-71, 13 A.L.R.3d 799 (1969) (en banc); *State Bar Ass'n of Conn. v. Connecticut Bank & T. Co.,* 145 Conn. 222, 140 A.2d 863, 868-69, 69 A.L.R.2d 394 (1958); *Application of Kaufman,* 69 Idaho 297, 206 P.2d 528, 531-39 (1949); *In re Mitan,* 75 Ill. 2d 118, 25 Ill. Dec. 622, 387 N.E.2d 278, 280 (1979), *cert. denied,* 444 U.S. 916 (1979); *Matter of Kesler,* 397 N.E.2d 574, 575 (Ind. 1979); *Committee on Professional Ethics v. Gartin,* 272 N.W.2d 485, 487 (Iowa 1979); *State v. Schumacher,* 210 Kan. 377, 502 P.2d 748, 752 (1972); *Ratterman v. Stapleton,* 371 S.W.2d 939, 940-42 (Kentucky 1963); *Scott v. Kemper Ins. Co.,* 377 So. 2d 66, 69 (La. 1979); *Board of Overseers of the Bar v. Freddie F. Lee,* 422 A.2d 998, 49 U.S.L.W. 2370 (Me. 1980); *Collins v. Godfrey,* 324 Mass.

574, 87 N.E.2d 838, 839-41 (1949); *Opinion of the Justices,* 289 Mass. 607, 194 N.E. 313, 316 (1935); *Sharood v. Hatfield,* 296 Minn. 416, 210 N.W.2d 275, 279-82 (1973); *Bramlett v. Burgin,* 382 So. 2d 284, 285-86 (Miss. 1979); *Matter of Mississippi State Bar,* 361 So. 2d 503, 505-06 (Miss. 1978); *Clark v. Austin,* 340 Mo. 467, 101 S.W.2d 977, 980-85 (1937); *State v. Barlow,* 131 Neb. 294, 268 N.W. 95, 97-98 (1936); *In re Mussman's Case,* 111 N.H. 402, 286 A.2d 614, 619-20 (1971); *Goodwin Motor Corp. v. Mercedes-Benz, etc.,* 172 N.J. Super. 263, 411 A.2d 1144, 1149 (1980); *Archer v. Ogden,* 600 P.2d 1223, 1226-27 (Okla. 1979); *Wajert v. State Ethics Commission,* 420 A.2d 439, 442 (Pa. 1980); *Banales v. Jackson,* 601 S.W.2d 508, 510-12 (Tex. Civ. App. 1980); *Richmond Ass'n of Credit of Men v. Bar Ass'n.,* 167 Va. 327, 189 S.E. 153, 157 (1936); *Matter of Washington State Bar Association,* 86 Wash. 2d 624, 548 P.2d 310, 315-16 (1976) (en banc); *West Virginia State Bar v. Earley,* 144 W. Va. 504, 109 S.E.2d 420, 435-39 (1959); *State v. Cannon, supra,* 240 N.W. at 450-56; *Mendicino v. Whitchurch,* 565 P.2d 460, 475 (Wyo. 1977).

The statements of this and other courts announcing the obligation of the judicial branch of government to monitor and manage its own house are not hollow proclamations of power, for the placement of this responsibility with the judiciary represents a recognition of the special, and to a degree, unique relationship that has evolved over the years between the legal profession and the tribunals of justice it serves. In this country, it is a well known maxim that attorneys function as officers of the courts, and, as such, are a necessary and important adjunct to the administration of justice. This truism necessarily derives, in our view, from the very theory of the structure of our system of justice. The adversary process integral to the design of our dispute-resolving scheme is perhaps one of the more remarkable accomplishments of western jurisprudence. It is this process, whereby truth is garnered from the articulation of opposing points of view, that is the preeminent tool through which fairness is achieved in the administration of justice in this country.

A trial is not a dispassionate and cooperative effort by all the parties to arrive at justice. . . . In a court there is a judge, who is to pass on the questions, and there are lawyers on each side. Under the American system, the judge is relatively passive, listening, moderating, and passing on what is offered to him. But neither the judge nor any other representative of the public is active in developing the facts. The lawyers are the ones who develop and present the case. They do so, each for his own side and not for both sides. If one lawyer is poor or lazy, his side suffers accordingly. If the other lawyer is unscrupulous, his side may benefit unduly. [Cheatham, *The Lawyer's Role and Surroundings,* 25 Rocky Mtn. L. Rev. 405, 409 (1953). See also McCracken, *The Maintenance of Professional Standards: Duty and Obligation of The Courts,* 29 S. Cal. L. Rev. 65, 85-86 (1955).]

Without a vigorous, honorable and qualified bar, the judiciary of this State, to put it quite simply, would be greatly handicapped if not completely incapable of performing those duties assigned to it. Moreover, the legal profession, for time out of mind, has been infused with and, in a sense, been a trustee for, the public interest. Both the existence of this responsibility resting with the profession and the consequential necessity of judicial supervision of it were earlier verbalized by this Court's opinion in *Maryland St. Bar Ass'n v. Agnew:*

Few vocations offer as great a spectrum for good and honorable works as does the legal profession. The attorney is entrusted with the life savings and investments of his clients. He becomes the guardian of the mentally deficient, and potential savior for the accused. He is a fiduciary, a confidant, an advisor, and an advocate. . . . [I]t can be said that the presence of [truth, candor and honesty] in members of the bar compris[e] a large portion of the fulcrum upon which the scales of justice rest. . . . A

> court has the duty, since attorneys are its officers, to insist upon the maintenance of the integrity of the bar and to prevent the transgressions of an individual lawyer from bringing its image into disrepute. . . . The administration of justice under our adversary system largely depends upon the public's ability to rely on the honesty of attorneys who are placed in a position of being called upon to conduct the affairs of others both in and out of court.
> [271 Md. at 549, 318 A.2d at 814.]

In recognition of this historical and deep-rooted interdependence between the judiciary and those who practice before it, the opinions of the courts of this country are replete with similar statements of the necessity for judicial governance of the legal fraternity. *See, e.g., Board of Overseers of the Bar v. Lee, supra* (power to define and regulate practice naturally and logically belongs to judicial department; admission and disbarment is ultimate exercise of that power); *Sharood v. Hatfield, supra,* 210 N.W.2d at 279 (to effectively perform functions and duties, essential that court have assistance and cooperation of an able, vigorous and honorable bar); *Clark v. Austin, supra,* 101 S.W.2d at 981 (practice of law so linked with judiciary that right to define and regulate practice logically and naturally belongs to judiciary); *Swenson v. Thibaut,* 39 N.C. App. 77, 250 S.E.2d 279, 299 (1978), *appeal dismissed,* 254 S.E.2d 183 (1979) (power of court essential to protect from fraud, impropriety and to serve the ends of the administration of justice which are the raison d'etre for its existence); *State v. Cannon, supra,* 221 N.W. at 604 (inherent power exists because attorneys, as officers of the court, are responsible in no small degree for the quality of justice administered by the courts). In light of the intimate relationship between the learning and character of attorneys, the perceptions of the public, and the performance by the courts of their constitutionally assigned functions, we are confident that, as a general matter, the proper repository for the authority, responsibility and obligation to regulate the profession, in

our scheme of constitutionally divided realms of power, is and must ultimately be the judiciary of this State.

Having reached this conclusion, however, we observe that Maryland's judiciary in the past generally has been able to harmonize its obligations with enactment by the General Assembly of a restricted class of statutes relating to the legal profession, passed by the Legislature pursuant to its interest in promoting the health, safety and welfare of the people of this State. This harmony heretofore has been possible because the legislation has been calculated to, and did, augment the ability of the courts to carry out their constitutional responsibilities; at the most, there was but a minimal intrusion. *E.g.,* Md. Code (1957, 1981 Repl. Vol.), Art. 10, § 10 (prescribing oath of office for admission to the bar); Code (1957, 1981 Repl. Vol.), Art. 10, § 43 (authorizing creation by Court of Appeals of a client security fund) and Md. Rule 1228 (creating such a trust fund); Code (1957, 1978 Repl. Vol., 1980 Cum. Supp.), Art. 40A, § 4-105 (a) (legislative request that Court of Appeals devise rules prescribing financial disclosure by members of judicial branch) and Md. Rule 1231 (Rules of Judicial Ethics, number 8) and Md. Rule 1232 (Rules of Conduct, number 12) (each requiring appropriate financial disclosure); *see* Code (1957, 1976 Repl. Vol.), Art. 10, §§ 13-26 (repealed by Acts 1977, ch. 305) (misconduct of attorneys). *See generally* 52 Transactions Maryland State Bar Association 154, 154-59 (1947); Chroust, *The Rise of the Legal Profession in America II,* 258-61 (1965). Thus, in furtherance of the comity that has traditionally existed between these coequal branches of our State's government, we have spoken in the past of a "comfortable accommodation" which has developed between them in regard to the specific regulation of certain aspects of the legal profession. *Pub. Serv. Comm'n v. Hahn Transp., Inc., supra,* 253 Md. at 583, 253 A.2d at 852. *Accord, e.g., Ex Parte Secombe,* 60 U.S. (19 How.) 9, 14 (1856); *Denver Bar Association v. Public Utilities Commission, supra,* 391 P.2d at 470 ("gratuitous" legislation); *Board of Overseers of the Bar v. Lee, supra* (recognition of legislation as a "matter of comity"); *Clark v.*

*Austin, supra,* 101 S.W.2d at 984; *West Virginia State Bar v. Earley, supra,* 109 S.E.2d at 438 (statutes "declaratory of power inherent" in court); *State v. Cannon, supra,* 221 N.W. at 605 (comity). There can be no doubt, however, that the deferential respect accorded the legislative branch by the judicial must neither undermine nor dilute the fundamental authority and responsibility vested in the judiciary to carry out its constitionally required function, an aspect of which, as we have seen, is the supervision of practicing attorneys. Nonetheless, the flexibility that inheres in the separation of powers doctrine allows for some limited exertion of legislative authority. As a consequence of this elasticity, we have recognized, first, that the General Assembly may act pursuant to its police or other legitimate power to aid the courts in the performance of their judicial functions, *Pub. Serv. Comm'n v. Hahn Transp., Inc., supra,* 253 Md. at 583, 253 A.2d at 852; see, *e.g.,* Md. Code (1957, 1976 Repl. Vol., 1980 Cum. Supp.), Art. 10, §§ 1, 2, 3, 11, 26A, 32, 33, 43, 44; *accord, Denver Bar Association v. Public Utilities Commission, supra,* 391 P.2d at 470; *People v. Goodman,* 366 Ill. 346, 8 N.E.2d 941, 944 (1937), *cert. denied,* 302 U.S. 728 (1937); *Collins v. Godfrey, supra,* 87 N.E.2d at 840; *Matter of Mississippi State Bar, supra,* 361 So. 2d at 505; and, second, that the General Assembly may establish minimum criteria for the learning and character of persons admitted to the bar of this State. See *Bastian v. Watkins,* 230 Md. 325, 187 A.2d 304 (1963); *In re Maddox,* 93 Md. 727, 50 A. 487 (1901). *Accord, e.g., Application of Houston, supra,* 378 P.2d at 645; *Application of Kaufman, supra,* 206 P.2d at 539; *Collins v. Godfrey, supra; State v. Barlow, supra,* 268 N.W. at 97. However, since admission to the bar is a judicial function, the Legislature may not prescribe the maximum qualifications necessary for admittance, for this Court is always free to adopt any additional requirements it deems necessary to maintain a high level of professional competence in the bar and promote public trust in and respect for the profession. *Accord, Application of Houston, supra,* 378 P.2d at 645; *Brydonjack v. State Bar, supra,* 281 P.2d at 1020; *Application of Kaufman, supra,* 206 P.2d at 539; *Collins v. Godfrey,*

*supra,* 87 N.E.2d at 840; *State v. Barlow, supra,* 268 N.W. at 98; *West Virginia State Bar v. Earley, supra,* 109 S.E.2d at 438-39. Even when legislating the minimum requisites to the practice of law, the power of the General Assembly is not unlimited; the Legislature may not constitutionally place restrictions on the practice so onerous or burdensome that they impinge on the ability of the judicial branch to carry out its duties. We give an example — a legislative restriction on admission to the legal profession that limits entry to such a degree that courts are deprived of sufficient officers to fulfill their constitutionally assigned functions could not withstand examination.

When establishing minimum criteria for bar admission, the General Assembly pursues its vision of what is useful for the promotion of the general welfare of the people of this State, acting by virtue of the broad police powers vested in that body. See *Md. Coal, etc. Co. v. Bureau of Mines,* 193 Md. 627, 69 A.2d 471 (1949). The exercise of this "inherent attribute and prerogative of sovereignty ... has been described as essentially 'no more than the power to govern.'" *Stevens v. City of Salisbury,* 240 Md. 556, 564, 214 A.2d 775, 779 (1965) (quoting *Allied American Co. v. Comm'r.,* 219 Md. 607, 150 A.2d 421 (1959)). In a democracy, however, where government is limited, all power has corresponding restraints. Since the police power "inheres in and springs from the nature of our institutions, ... the limitations upon it are those which spring from the same source as well as those expressly set out in the Constitution." *Smith v. Higinbothom,* 187 Md. 115, 128, 48 A.2d 754, 761 (1946). Separation of powers, which emanates from the governmental structure our forefathers erected, as is made manifest in our organic law, is by design such a limitation.

In view of the three-fold separation of powers specifically ordained by our State's constitution, we think it clear that section 56 (c) cannot pass muster. It is not in the same mold as any type of enactment previously recognized by this Court to be a legitimate exercise of legislative power — that is, it cannot realistically be considered a provision to aid the

judiciary in carrying out its constitutional obligations, or one establishing minimum standards for admission to the practice of law in this State. Nor does section 56 (c) spawn a third category which can be the subject of proper legislative action. Having satisfied all the criteria, both legislatively and judicially imposed, for admission to the practice of law, and upon being so admitted, an attorney may be deprived of his license only through judicial action for proper cause, and any attempt by the legislature to effect the same result by enactment must fail as an unconstitutional usurpation of a power vested exclusively in the judiciary. *Accord, Archer v. Ogden,* 600 P.2d 1223, 1226 (Okla. 1979); *State v. Barlow,* 131 Neb. 294, 268 N.W. 95 (1936); *Wajert v. State Ethics Commission,* 420 A.2d 439, 442 (Pa. 1980); *Matter of Washington State Bar Association,* 86 Wash. 2d 624, 548 P.2d 310, 315 (1976) (en banc). Because the problem presented to the United States Supreme Court over a hundred years ago is so analogous to the one here presented, and since the views expressed in resolving the issue there so nearly coincide with those we entertain, a lengthy quote from the opinion of Justice Field for the Supreme Court is warranted:

> The statute is directed against parties who have offended in any of the particulars embraced by these clauses. And its object is to exclude [among others, practicing attorneys loyal to the Confederacy during the Civil War] from the profession of the law, or at least from its practice in the courts of the United States. As the oath prescribed cannot be taken by these parties, the Act, as against them, operates as a legislative decree of perpetual exclusion.

> * * *

> The profession of an attorney and counselor is not like an office created by an Act of Congress, which depends for its continuance, its powers and its emoluments, upon the will of its creator, and the possession of which may be burdened with any

conditions not prohibited by the Constitution. Attorneys and counselors are not officers of the United States; they are not elected or appointed in the manner prescribed by the Constitution for the election and appointment of such officers. They are officers of the court; admitted as such by its order, upon evidence of their possessing sufficient legal learning and fair private character. . . . The order of admission is the judgment of the court that the parties possess the requisite qualifications as attorneys and counselors, and are entitled to appear as such and conduct causes therein. From its entry the parties become officers of the court, and are responsible to it for professional misconduct. They hold their office during good behavior, and can only be deprived of it for misconduct ascertained and declared by the judgment of the court after opportunity to be heard has been afforded. Their admission or their exclusion is not the exercise of a mere ministerial power. It is the exercise of judicial power, and has been so held in numerous cases. . . . "Attorneys and counselors . . . are not only officers of the court, but officers whose duties relate almost exclusively to proceedings of a judicial nature. And hence their appointment may, with propriety, be intrusted to the courts, and the latter in performing this duty may very justly be considered as engaged in the exercise of their appropriate judicial functions."

\* \* \*

The attorney and counselor being, by the solemn judicial act of the court, clothed with his office, does not hold it as a matter of grace and favor. The right which it confers upon him to appear for suitors, and to argue causes, is something more than a mere indulgence, revocable at the pleasure of the court, or at the command of the Legislature. It is a right of which he can only be deprived by the judgment of

the court, for moral or professional delinquency.
[*Ex parte Garland,* 71 U.S. (4 Wall.) 333, 377-79, 18
L. Ed. 366 (1867) (citations omitted).]

These principles expressed by Justice Field are equally applicable to the problem presented by this case. The concern of the Legislature manifested by the enactment and suggested by the State — the avoidance of the appearance of, or actual, undue influence exerted by former judges when practicing before ex-colleagues on the bench — is one that has been extensively addressed by this Court pursuant to its rulemaking power. See Md. Rule 1220 a and b; Md. Rule 1231 (Canons of Judicial Ethics, Canons IV, XIII, XVI, XXV, XXVIII, XXX, XXXI, XXXII, XXXIII), (Rules of Judicial Ethics, Rules 2, 3, 5, 7, 9 and 12); Md. Rule 1230 (Code of Professional Responsibility, Canon 8 and 9, and the disciplinary rules thereunder). See also Maryland Constitution, Art. IV, § 7. *Accord, Wajert v. State Ethics Commission, supra,* 420 A.2d at 442. The defect which surfaces from the regulation contained in section 56 (c) is that it, in effect, revokes the license of certain members of the bar based upon criteria entirely unrelated to their educational or moral fitness to engage in the practice of law; it is, thus, unrelated to the Legislature's legitimate interest in prescribing proper prerequisites for entry into the profession. As section 56 (c) does not fall within an area of legitimate legislative concern regarding the legal profession and its practitioners, the General Assembly has acted outside the domain, albeit wide, of its constitutional bailiwick.

### III

### *Equal Protection*

We turn now to consider appellee's second contention, namely, that section 56 (c) operates to deny Judge Waldron and those similarly situated equal protection of the law. In connection with this argument, we observe that the most delicate and difficult decisions to be made in cases, such as the one before us challenging the constitutionality of legisla-

tive actions, arise where we must determine when to defer to legislative discretion to attack a perceived problem by whatever means chosen, and when the Legislature, in the exercise of that discretion, has crossed the line of constitutional impermissibility. However, when an enactment invades protected rights to life, liberty, property or other interests secured by the fundamental doctrines of our jurisprudence, there is reason to be especially vigilant in the exercise of our constitutional duty. In this regard, we are concerned with provisions contained in both the federal and our State constitutions.

It is the fourteenth amendment of the United States Constitution which is here involved, where it provides in pertinent part: "No State shall deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. Although the Maryland Constitution contains no express equal protection clause, we deem it settled that this concept of equal treatment is embodied in the due process requirement of Article 24 of the Declaration of Rights.[7] *Board of Supervisors of Elections v. Goodsell,* 284 Md. 279, 293 n.7, 396 A.2d 1033, 1040 (1979); *Governor v. Exxon Corp.,* 279 Md. 410, 438 n.8, 370 A.2d 1102, 1118 (1977) *aff'd,* 437 U.S. 117 (1978); *Bruce v. Dir., Chesapeake Bay Aff.,* 261 Md. 585, 600, 276 A.2d 200, 208 (1971); *see Detroit Automotive Purchasing Services v. Lee,* 463 F. Supp. 954, 970 (1978).[8] It is, perhaps, because this State has no express equal protection clause that Article 24 has been interpreted to apply "in like manner and to the same extent as the Fourteenth Amendment of the Federal Constitution," *United States Mortgage Co. v. Matthews,* 167 Md. 383, 395,

---

**7.** "That no man ought to be taken or imprisoned or disseized of his freehold, liberties or privileges, or outlawed, or exiled, or, in any manner, destroyed, or deprived of his life, liberty or property, but by the judgment of his peers, or by the Law of the land." Maryland Declaration of Rights, Art. 24.

**8.** This result is similar to that reached by the United States Supreme Court in Bolling v. Sharpe, 347 U.S. 497, 74 S. Ct. 693, 98 L. Ed. 884 (1954), where it held that the due process clause of the fifth amendment of the U.S. Constitution implicitly includes an equal protection element applicable to the federal government. *See* Weinberger v. Weisenfeld, 420 U.S. 636, 638 n.2, 95 S. Ct. 1225, 43 L. Ed. 2d 514 (1975).

173 A. 903, 909 (1934), *rev'd on other grounds,* 293 U.S. 232 (1934); *see Detroit Automotive Purchasing Services v. Lee, supra,* so that "decisions of the Supreme Court on the Fourteenth Amendment are practically direct authorities." *Bureau of Mines of George's Creek,* 272 Md. 143, 156, 321 A.2d 748, 755 (1974). While it is true, as our later discussion will show, that the equal protection guaranties of Article 24 and the fourteenth amendment are independent, capable of divergent effect, it is apparent that the two are so intertwined that they, in essence, form a double helix, each complementing the other. Because the decisions of the United States Supreme Court are not only controlling as to our interpretation and application of the equal protection clause of the fourteenth amendment but also persuasive as we undertake to interpret Article 24, we first examine the currents of the federal analysis prior to determining the impact of these constitutional guaranties in this case.[9]

Upon inspecting the multitude of cases applying the equal protection clause of the fourteenth amendment, it becomes apparent that, with this evolving doctrine, "[c]onfusion now hath made his masterpiece."[10] Plowing through this morass, it seems that the foundation of equal protection analysis, at least until the last ten years, rested on the bedrock of a two-tier scrutiny largely refined by the Supreme Court over the previous three decades. *See Toyosaburo Korematsu v. United States,* 323 U.S. 214, 216, 65 S. Ct. 193, 89 L. Ed. 194 (1944). The top tier of this review contemplates that when a statute creates a distinction based upon clearly "suspect" criteria, or when that enactment infringes upon personal rights or interests deemed to be "fundamental," then the legislative product must withstand a rigorous,

---

**9.** Resurging federalism and the increasing divergence between state and federal constitutional adjudication demonstrate the importance to parties of examining not only the federal Constitution but also the Maryland Constitution and raising appropriate issues under each. *See* Minnesota v. Clover Leaf Creamery Company, — U.S. —, 101 S. Ct. 715, 66 L. Ed. 2d 659 (1981); United States v. Miller, 425 U.S. 435, 454 n.4, 96 S. Ct. 1619, 48 L. Ed. 2d 71 (1976) (Brennan, J., dissenting).

**10.** W. Shakespeare, Macbeth, Act II.

"strict scrutiny." Laws which are subject to this demanding review violate the equal protection clause "unless the State can demonstrate that such laws are '*necessary* to promote a *compelling* governmental interest.'" *Dunn v. Blumstein,* 405 U.S. 330, 342, 92 S. Ct. 995, 31 L. Ed. 2d 274 (1972) (quoting *Shapiro v. Thompson,* 394 U.S. 618, 634, 89 S. Ct. 1322, 22 L. Ed. 2d 600 (1969) (emphasis in original). A suspect class is a category of people who have "experienced a 'history of purposeful unequal treatment' or been subjected to unique disabilities on the basis of stereotyped characteristics not truly indicative of their abilities." *Massachusetts Bd. of Retirement v. Murgia,* 427 U.S. 307, 313, 96 S. Ct. 2562, 49 L. Ed. 2d 520 (1976). Placed in the suspect category by the Supreme Court thus far are those classifications based on race, *McLaughlin v. Florida,* 379 U.S. 184, 85 S. Ct. 283, 13 L. Ed. 2d 222 (1964), national origin, *Graham v. Richardson,* 403 U.S. 365, 91 S. Ct. 1848, 29 L. Ed. 2d 534 (1971), and ancestry, *Oyama v. California,* 332 U.S. 633, 68 S. Ct. 269, 92 L. Ed. 249 (1948). Fundamental rights or interests are those "explicitly or implicitly guaranteed" by the federal constitution, *San Antonio School Dist. v. Rodriguez,* 411 U.S. 1, 33-34, 93 S. Ct. 1278, 36 L. Ed. 2d 16 (1973); *see Police Department of Chicago v. Mosley,* 408 U.S. 92, 101, 92 S. Ct. 2286, 33 L. Ed. 2d 212 (1972) (first amendment rights), and they, as presently delineated by the Supreme Court, include the right to vote, *Harper v. Virginia Bd. of Elections,* 383 U.S. 663, 86 S. Ct. 1079, 16 L. Ed. 2d 169 (1966), the right of interstate travel, *Shapiro v. Thompson,* 394 U.S. 618, 89 S. Ct. 1322, 22 L. Ed. 2d 600 (1969), the right of equal access to a criminal appeal, *Griffin v. Illinois,* 351 U.S. 12, 76 S. Ct. 585, 100 L. Ed. 891 (1956), and the right to procreate, *Skinner v. Oklahoma ex rel Williamson,* 316 U.S. 535, 62 S. Ct. 1110, 86 L. Ed. 1655 (1942). *See also Zablocki v. Redhail,* 434 U.S. 374, 98 S. Ct. 673, 54 L. Ed. 2d 618 (1978) (plurality) (right to marry "fundamental"; statute restricting right received "critical examination").

If, on the other hand, neither a suspect class nor a fundamental right or interest is implicated, then the traditional

equal protection analysis calls forth a much less demanding standard of review under the second tier — the "rational basis" test. Using this approach, a statutory classification is struck down, in the oft-expressed words of the Supreme Court, only if the means chosen by the legislative body are "wholly irrelevant to the achievement of the State's objective." *McGowan v. Maryland,* 366 U.S. 420, 425, 81 S. Ct. 1101, 6 L. Ed. 2d 393 (1961); *McDonald v. Board of Election,* 394 U.S. 802, 809, 89 S. Ct. 1404, 22 L. Ed. 2d 739 (1969). The Supreme Court, in applying this test, has been willing to uphold the constitutionality of an enactment when "any state of facts reasonably may be conceived to justify it." *McGowan v. Maryland, supra* at 426. See *Holt Civic Club v. City of Tuscaloosa,* 439 U.S. 60, 99 S. Ct. 383, 58 L. Ed. 2d 292 (1978); *Kotch v. Pilot Comm'rs,* 330 U.S. 552, 67 S. Ct. 910, 91 L. Ed. 1093 (1947). This deferential review of state legislative classifications operates, at least in the sphere of economic regulation, "quite apart from whether the conceivable 'state of facts' (1) actually exists, (2) would convincingly justify the classification if it did exist, or (3) has ever been urged in the classification's defense by those who either promulgated it or have argued in its support." L. Tribe, *American Constitutional Law* § 16-3, p. 996 (1978) (hereinafter cited as Tribe). See, *e.g., Minnesota v. Clover Leaf Creamery Company,* — U.S. —, 101 S. Ct. 715, 66 L. Ed. 2d 659 (1981); *U.S. Railroad Retirement Bd. v. Fritz,* — U.S. —, 101 S. Ct. 453, 66 L. Ed. 2d 368 (1980); *McDonald v. Board of Election, supra: Allied Stores of Ohio v. Bowers,* 358 U.S. 522, 528-29, 79 S. Ct. 437, 3 L. Ed. 2d 480 (1959); *Kotch v. Pilot Comm'rs, supra; Lindsley v. Natural Carbonic Gas Co.,* 220 U.S. 61, 31 S. Ct. 337, 55 L. Ed. 369 (1911).

In the last decade, however, dissatisfaction on the part of the Supreme Court with the rigid two-tier analysis has become evident. It appears to us that this is a natural result of the limitations inherent in the analysis — to determine the level of scrutiny is, in large measure, to decide the case. A statute subject to strict scrutiny is nearly always struck

down under an analysis which is " 'strict' in theory and fatal in fact." Gunther, *The Supreme Court, 1971 Term: Foreword: In Search of Evolving Doctrine On a Changing Court: A Model for a Newer Equal Protection,* 86 Harv. L. Rev. 1, 8 (1972) (hereinafter cited as Gunther); see *Massachusetts Bd. of Retirement v. Murgia,* 427 U.S. 307, 317-27, 96 S. Ct. 2562, 49 L. Ed. 2d 520 (1976) (Marshall, J., dissenting). And a statute subjected to the rational basis test as articulated receives "minimal scrutiny in theory and virtually none in fact." Gunther, at 8; see *U.S. Railroad Retirement Bd. v. Fritz, supra* at    , [49 U.S.L.W. at 4040] (Brennan, J., dissenting); *New Orleans v. Dukes,* 427 U.S. 297, 96 S. Ct. 2513, 49 L. Ed. 2d 511 (1976) (overruling *Morey v. Doud,* 354 U.S. 457, 77 S. Ct. 1344, 1 L. Ed. 2d 1485 (1957), the only modern case in which the Supreme Court struck down a purely economic regulation on equal protection grounds).

The Supreme Court has responded to the limitations of the traditional bifurcated approach in a varied and, at times, seemingly conflicting manner.[11] In the face of a strict scrutiny test that foreordains the invalidation of nearly every classification involving such analysis, it is not surprising that the Court has thus far declined to expand the group of fundamental interests and suspect classes that will trigger analysis under this standard. *See, e.g., San Antonio School District v. Rodriguez,* 411 U.S. 1, 93 S. Ct. 1278, 36 L. Ed. 2d 16 (1973) (education not a fundamental interest, nor are distinctions based on wealth suspect classifications); *Massachusetts Bd. of Retirement v. Murgia, supra* (age not suspect; no fundamental right to continued governmental employment); *Frontiero v. Richardson,* 411 U.S. 677, 93 S. Ct. 1764, 36 L. Ed. 2d 583 (1973) (sex not suspect); *Lindsey v. Normet,* 405 U.S. 56, 92 S. Ct. 862, 31 L. Ed. 2d 36 (1972) (no fundamental interest in right to occupy home).

---

11. One commentator notes that "[r]ecent equal protection decisions ... have accentuated [a] sense of drift" rather than a trend toward a hoped-for model that would avoid " 'toothless' deference to most legislative enactments and simultaneously avoid the subjective and disordered application of strict judicial review." Wilkinson, *The Supreme Court, The Equal Protection Clause, and the Three Faces of Constitutional Equality,* 61 Va. L. Rev. 945, 950-51 (1975).

Nevertheless, while eschewing strict scrutiny and espousing rational basis, the Supreme Court, faced in recent years with cases implicating important private interests or burdened classes, has struck down many enactments that it is doubtful would have survived the most deferential form of rational basis scrutiny exemplified by *McGowan v. Maryland, supra,* and *McDonald v. Board of Election, supra.*[12] For example, in *Reed v. Reed,* 404 U.S. 71, 92 S. Ct. 251, 30 L. Ed. 2d 225 (1971), a unanimous Court overturned an Idaho statute which gave preference to men over women when both, equally qualified, applied for appointment to administer a decedent's estate. While purporting to rely on rational basis review, the *Reed* court resurrected language from *Royster Guano Co. v. Virginia,* 253 U.S. 412, 415, 40 S. Ct. 560, 64 L. Ed. 989 (1920), indicating that a legislative classification "must be reasonable, not arbitrary, and must rest upon some ground of difference having a fair and substantial relation to the object of the legislation, so that all persons similarly circumstanced shall be treated alike." The fair and substantial relation test articulated in *Royster Guano* had fallen into disuse, for as far as we can discern, that case was never quoted or relied upon by the High Court during at least the two decades preceding the *Reed* decision.[13] In this regard, we think it significant that the *Reed* court did not speculate as to hypothetical justifications for the contested legislation whose objectives, admittedly, had "some legitimacy." 404 U.S. at 76. The analysis utilized by the Court in *Reed,* although not raising gender-based classifications to a level requiring strict scrutiny, exhibits to us a special sensitivity to, and a heightened review of, sex when used as a

---

**12.** In *McDonald,* Chief Justice Warren noted for the Court that "[l]egislatures are presumed to have acted constitutionally even if source materials normally resorted to for ascertaining their grounds for action are otherwise silent, and their statutory classifications will be set aside only if no grounds can be conceived to justify them." 394 U.S. at 809.

**13.** The apparently conflicting strands of equal protection analysis epitomized by *Reed* and *McGowan* have long existed in the body of jurisprudence embellishing the equal protection clause. *Compare* Lindsley v. National Carbonic Gas Co., 220 U.S. 61, 78, 31 S. Ct. 337, 55 L. Ed. 369 (1911) *with* Royster Guano Co. v. Virginia, 253 U.S. 412, 415, 40 S. Ct. 560, 64 L. Ed. 989 (1920) *and* Hartford Co. v. Harrison, 301 U.S. 459, 462, 57 S. Ct. 838, 81 L. Ed. 1223 (1937).

classifying factor.[14] Nor has the Supreme Court limited the application of this apparent heightened scrutiny to gender-based classifications, for the Court has engaged in an active review of legislation not implicating rights previously determined to be "fundamental" or involving classifications held to be "suspect." See, *e.g., Eisenstadt v. Baird,* 405 U.S. 438, 447, 92 S. Ct. 1029, 31 L. Ed. 2d 349 (1972) (Court refused to accept profferred statutory ends, but instead focused on means-oriented search for actual purpose; statutory distinction between married and unmarried persons bore no "fair and substantial" relation to sole perceived purpose of prohibiting use of contraceptives); *Johnson v. Robison,* 415 U.S. 361, 374-75, 94 S. Ct. 1160, 39 L. Ed. 2d 389 (1974) (the Court, praising Congress for revealing in the statute its objectives, upheld legislation denying veteran's benefits to conscientious objectors after finding that the resulting distinction between veterans and conscientious objectors bore a "fair and substantial relation" to each stated purpose).[15]

Having demonstrated the occasional employment by the Supreme Court of a rational basis scrutiny that is not "toothless," *Mathews v. Lucas,* 427 U.S. 495, 510, 96 S. Ct. 2755, 49 L. Ed. 2d 651 (1976), we briefly examine the broadening array of cases which trigger this "sharper focus." *Craig v. Boren,* 429 U.S. 190, 210-11, 97 S. Ct. 451, 50 L. Ed.

---

14. Indeed, in Frontiero v. Richardson, 411 U.S. 677, 682, 93 S. Ct. 1764, 36 L. Ed. 2d 583 (1973), decided in the term following *Reed,* four Justices found "at least implicit support" in that case for a determination that classifications based on sex are "inherently suspect" and subjected to "close judicial scrutiny." *Frontiero,* however, proved to be the high water mark for the sex-as-suspect trend; in Craig v. Boren, 429 U.S. 190, 197, 97 S. Ct. 451, 50 L. Ed. 2d 397 (1976), the Court openly settled on an intermediate review of these classifications by holding, on the authority of *Reed,* that classification by gender "must serve important governmental objectives and must be substantially related to achievement of those objectives."

15. We recognize that the "fair and substantial relation" formula is not the only indication of heightened judicial scrutiny lurking behind the apparent invocation of the rational basis standard. Nevertheless, we focus our analysis here on the ramifications of that standard when invoked by the Supreme Court because, as will be demonstrated later in the text, many of the equal protection decisions of this Court utilize the same terminology, and because this approach is fairly representative of the methodology of the so-called intermediate scrutiny.

2d 397 (1976) (Powell, J., concurring). These cases apparently fall within two general categories which, not surprisingly, parallel the two groupings that trigger application of the strict scrutiny test. First are those enactments which impact upon "sensitive, although not necessarily suspect criteria of classification." *Tribe* at 1090.[16] To date, this group clearly encompasses gender discriminations, *e.g., Caban v. Mohammed,* 441 U.S. 380, 99 S. Ct. 1760, 60 L. Ed. 2d 297 (1979); *Craig v. Boren, supra,* and probably includes those classifications based on illegitimacy. See *Trimble v. Gordon,* 430 U.S. 762, 97 S. Ct. 1459, 52 L. Ed. 2d 31 (1977).[17] The second category of statutes which activate heightened scrutiny are those which affect "important" personal interests or work a "significant interference with liberty or a denial of a benefit vital to the individual." *Tribe* at 1090. Professor Tribe's amorphous characterization of this category derives from an analysis of decisions which share that quality. We find *United States Department of Agriculture v. Moreno,* 413 U.S. 528, 93 S. Ct. 2821, 37 L. Ed. 2d 782 (1973), typical of this genus, where an amendment to the federal food stamp program which denied the stamps to households comprised of unrelated members was held irrational despite government assertions that the provision helped to prevent fraud. See also *Eisenstadt v. Baird, supra; Hampton v. Mow Sun Wong,* 426 U.S. 88, 102-03, 96 S. Ct. 1895, 48 L. Ed. 2d 495 (1976) (alien's "ineligibility for employment in a major sector of the economy" characterized as "deprivation of an interest in liberty" and warranting

---

**16.** One court has dubbed this approach "quasi-suspect classification." Alma Soc., Inc. v. Mellon, 601 F.2d 1225, 1233 (2d Cir. 1979), *cert. denied,* 444 U.S. 995 (1979).

**17.** From Mathews v. Lucas, 427 U.S. 495, 97 S. Ct. 2755, 49 L. Ed. 2d 651 (1976), we may surmise that this group enjoys less than the virtual automatic invalidation of laws effecting a discrimination against them that would result from strict scrutiny. The *Lucas* court, in rejecting a challenge to a provision of the Social Security Act which made it difficult for illegitimates to receive survivors' benefits, noted that the scrutiny involved was "less demanding" and that illegitimates did not "command [the] extraordinary protection. . . [afforded by] . . . our most exacting scrutiny." *Id.* at 505-06. In contrast, *see* Weber v. Aetna Casualty & Surety Co., 406 U.S. 164, 172, 92 S. Ct. 1400, 31 L. Ed. 2d 768 (1972), where the "sensitive and fundamental" rights of illegitimates received "a stricter scrutiny."

"some judicial scrutiny"). *See Vlandis v. Kline,* 412 U.S. 441, 459, 93 S. Ct. 2230, 37 L. Ed. 2d 63 (1973) (White, J., concurring) (denial of reduced tuition to out-of-state students who became residents interfered with "interest ... [in] obtaining a higher education").[18] Our analysis here seems to be in line with the individual views of a number of the members of the Supreme Court as expressed in their separate opinions.[19]

---

**18.** The majority in *Vlandis* held that a "permanent irrebuttable presumption of nonresidence" violated the due process clause. 412 U.S. at 453. Many legal scholars see this analysis, at least where the "flavor" of the claim is "distinctly one of equal protection," as a disguise for intermediate scrutiny. Wilkinson, *The Supreme Court, The Equal Protection Clause, and The Three Faces of Constitutional Equality,* 61 Va. L. Rev. 945, 953 (1975). *See, e.g.,* Cleveland Bd. of Educ. v. La Fleur, 414 U.S. 632, 94 S. Ct. 791, 39 L. Ed. 2d 52 (1974) (rule requiring pregnant teachers to take unpaid leave five months before expected childbirth voided under irrebuttable presumption analysis); *see also,* Bell v. Burson, 402 U.S. 535, 539, 91 S. Ct. 1586, 29 L. Ed. 2d 90 (1971) (statute requiring motorists involved in accidents to post bond or forfeit drivers license, without proof of fault, infringed "important interests of the licensees;" license may be "essential in the pursuit of a livelihood").

**19.** *See, e.g.,* Moore v. East Cleveland, 431 U.S. 494, 551, 97 S. Ct. 1932, 52 L. Ed. 2d 531 (1977) (White, J., dissenting) (characterizing the language of *Royster Guano* and *Reed* as representing "somewhat less" than strict scrutiny, but more than the "generally applicable standard of *McGowan*. . . ."); Zablocki v. Redhail, 434 U.S. 374, 397-400, 98 S. Ct. 673, 54 L. Ed. 2d 618 (1978) (Powell, J., concurring) (advocated use of the fair and substantial relation standard rather than strict scrutiny in reviewing a Wisconsin statute impinging "important" right to marry), *see also* Craig v. Boren, 429 U.S. 190, 211, 97 S. Ct. 451, 50 L. Ed. 2d 397 (1976); Trimble v. Gordon, 430 U.S. 762, 785, 97 S. Ct. 1459, 52 L. Ed. 2d 31 (1977) (Rehnquist, J., dissenting) (decrying the "familiar quotation from *Royster Guano*" since it arose in "a time when the Court was giving a broad reading to . . . the Equal Protection Clause. . . ."). Justice Marshall has also recognized that the Court has engaged in a more active review of legislative classification in certain cases. Massachusetts Bd. of Retirement v. Murgia, 427 U.S. 307, 319-21, 96 S. Ct. 2562, 49 L. Ed. 2d 520 (1976), Vance v. Bradley, 440 U.S. 93, 112-24, 99 S. Ct. 939, 951-57, 59 L. Ed. 2d 171 (1979), Weber v. Aetna Casualty and Surety Co., 406 U.S. 164, 172-73, 92 S. Ct. 1400, 31 L. Ed. 2d 768 (1972) (Marshall, J., dissenting in each) (when state statutory classifications impinge upon sensitive personal rights, Court exercises stricter scrutiny balancing two factors: legitimate state interest promoted against personal right endangered). This member of the Supreme Court advocates what has since been denominated by others to be the "sliding-scale" approach which, in the justice's view, would end the histrionics engaged in by a court whose words bow to the two-tier orthodoxy yet whose actions recognize that not every non-suspect or non-fundamental right or interest is the same. See in addition, U.S. Railroad Retirement Bd. v. Fritz, — U.S. —, 101 S. Ct. 453, 66 L. Ed. 2d 368 (1980) (Brennan, J., dissenting) (rational basis test always requires fair and substantial relation to statutory objectives).

The Supreme Court continues to deal with the press of equal protection cases, which litigation frequently results in a probing examination of the relation between legitimate, articulated statutory purposes and the classifications established to effectuate those purposes. *See, e.g., Vance v. Bradley,* 440 U.S. 93, 99 S. Ct. 939, 59 L. Ed. 2d 171 (1979); *San Antonio School District v. Rodriguez, supra.* On other occasions, the Court appears willing to engage in considerable speculation concerning possible justifications for a non-economic law not commanding the strictest scrutiny. *See, e.g., Holt Civic Club v. City of Tuscaloosa,* 439 U.S. 60, 99 S. Ct. 383, 58 L. Ed. 2d 292 (1978). Nevertheless, we do glean several precepts from the myriad Supreme Court holdings involving equal protection. When a court analyzes what it considers to represent a "local economic" regulation impacting on business interests, it should consistently defer "to legislative determinations as to the desirability of particular statutory discriminations . . . , [and] in such economic areas, . . . [legislatures may] implement their program step by step . . . adopting regulations that only partially ameliorate a perceived evil and deferring complete elimination of the evil to future regulations." *City of New Orleans v. Dukes,* 427 U.S. 297, 303, 96 S. Ct. 2513, 49 L. Ed. 2d 511 (1976). *See Minnesota v. Clover Leaf Creamery Company, supra,* 49 U.S.L.W. at 4113-17; *Hughes v. Alexandria Scrap Corp.,* 426 U.S. 794, 813, 96 S. Ct. 2488, 49 L. Ed. 2d 220 (1976). On the other hand, when important personal rights, not yet held to merit strict scrutiny but deserving of more protection than a perfunctory review would accord, are affected by a legislative classification, a court should engage in a review consonant with the importance of the personal right involved. This latter judicial inquiry does not tolerate random speculation concerning possible justifications for a challenged enactment; rather, it pursues the actual purpose of a statute and seriously examines the means chosen to effectuate that purpose. A loose fit between the legislative ends and the means chosen to accomplish those goals, which leaves a significant measure of similarly situated persons unaffected by the enactment, or conversely, which includes

individuals within the statute's purview who are not afflicted with the evil the statute seeks to remedy, is intolerable.

Peering through this kaleidoscope of federal equal protection, we now examine how this Court has applied that federal requirement, and of equivalent importance, interpreted the equal protection guaranty contained in Article 24 of the Maryland Declaration of Rights. When evaluating an equal protection claim grounded on Article 24, we utilize in large measure the basic analysis provided by the United States Supreme Court in interpreting the like provision contained in the fourteenth amendment. Consequently, when under the auspices of federal equal protection, certain important private interests are vindicated by the High Court through an active scrutiny of legislative classifications, it is not surprising that most of the decisions of this Court reflect the same trend. Although the equal protection clause of the fourteenth amendment and the equal protection principle embodied in Article 24 are "in pari materia," and decisions applying one provision are persuasive authority in cases involving the other, we reiterate that each provision is independent, and a violation of one is not necessarily a violation of the other. *See Minnesota v. Clover Leaf Creamery Company, supra,* 49 U.S.L.W. at 4112-13 n.6. In the instant case, however, our conclusion will be the same under both the federal and the State equal protection guaranties.[20]

---

**20.** Nevertheless, because the State equal protection principle is possessed of independent animation, in other circumstances the application of Article 24 of the Maryland Declaration of Rights may require a result at variance with the Supreme Court's application of the fourteenth amendment's equal protection clause. This degree of independence was well articulated by the North Dakota Supreme Court:

The State courts have not all, and not always, followed the changing approaches of the highest Court.

* * *

While some of our decisions would pass muster under the "inherently suspect" criteria..., and others under the "traditional" equal protection analysis, it may be that some of our statutes which we have declared unconstitutional might have passed the Federal constitutional screening. Such results are to be

Article 24 acts to vindicate important personal rights protected by the Maryland Constitution or those recognized as vital to the history and traditions of the people of this State. *See Bruce v. Dir., Chesapeake Bay Aff.,* 261 Md. 585, 276 A.2d 200 (1971) (rights of Maryland watermen to pursue crabs and oysters throughout the waters of the State). The vitality of this State's equal protection doctrine is demonstrated by our decisions which, although applying the deferential standard embodied in the rational basis test, have nevertheless invalidated many legislative classifications which impinged on privileges cherished by our citizens. *E.g., Md. St. Bd. of Barber Ex. v. Kuhn,* 270 Md. 496, 509-10, 312 A.2d 216, 224 (1973); *Bruce v. Dir., Chesapeake Bay Aff., supra,* 261 Md. at 600, 276 A.2d at 208; *Md. Coal, Etc. Co. v. Bureau of Mines,* 193 Md. 627, 643, 69 A.2d 471, 477 (1949); *Dasch v. Jackson,* 170 Md. 251, 268, 183 A. 534, 542 (1936); *Havre de Grace v. Johnson,* 143 Md. 601, 608-09, 123 A. 65, 68 (1923). *See also Wheeler v. State,* 281 Md. 593, 380 A.2d 1052 (1977), *cert. denied,* 435 U.S. 997 (1978); *O.C. Taxpayers v. Ocean City,* 280 Md. 585, 375 A.2d 541 (1977); *Davidson v. Miller,* 276 Md. 54, 344 A.2d 422 (1975). Indeed, this Court has indicated that a discriminatory classification may be an unconstitutional breach of the equal protection doctrine under the authority of Article 24 alone. See *Cohen v. Frey & Sons, Inc.,* 197 Md. 586, 610, 80 A.2d 267, 279 (1951).

With these principles in mind, we now specifically examine the statute challenged in this case. In *Chairman of Board*

---

expected under a dual constitutional system. The Federal courts examine State statutes only to determine if they comply with the United States Constitutional mandates . . . ; we examine them for that purpose and also to determine if they comply with State Constitutional mandates. . . . No one should be surprised if a statute passes the one set of standards and not the other. [Johnson v. Hassett, 217 N.W.2d 771, 775-76 (N.D. 1974); see Nehring v. Russell, 582 P.2d 67, 76 (Wyo. 1978) (finding of constitutionality under the federal equal protection clause not restrictive of what State court may find under its own constitution even though both provisions may have the same overall end).]

*See generally,* Brennan, *State Constitutions and the Protection of Individual Rights,* 90 Harv. L. Rev. 489 (1977); Howard, *State Courts and Constitutional Rights in the Day of the Burger Court,* 62 Va. L. Rev. 873 (1976).

*v. Waldron,* 285 Md. 175, 180, 401 A.2d 172, 175 (1979), we determined that section 56 (c) directly commands a retired judge who accepts the pension to which he is entitled not to engage in the practice of law for compensation. The statute does not establish a precondition for receipt of the pension; rather, it flatly prohibits this group of state pensioners from engaging in their profession for pay. It is important to bear in mind the exact burden on earning a livelihood placed upon appellee by section 56 (c). Former Judge Waldron, having earlier satisfied the educational and character prerequisites, remains a member in good standing of the Maryland Bar who, prior to judicial service, pursued the private practice of law as a livelihood. He now is entitled to receive a pension of eighteen thousand, two hundred twenty-nine dollars annually as partial recompense for his years of judicial service to the State. "This is a fully vested grant that subsection (c) in no way purports to restrict, limit or otherwise control." *Id.* at 180, 401 A.2d at 175. Should the judge, however, accept one penny of his pension, he is thereafter statutorily permanently precluded from the practice of his chosen profession for compensation. If this fixed income proves inadequate, the judge would, by the effect of the statute, be forced to find another source of livelihood. The appellee, inferring that he could not maintain his living standard on his approximately $18,000 pension alone, noted while testifying in the trial court, "I have found it rather difficult to talk to anyone about employment when, for most of my adult life, I have engaged in legal work and now I am restricted. . . . [I]f we take the field of law away from me at the age of sixty-one and a half, I don't have much to offer." It is this onerous burden placed only on certain retired judges which formed the gravamen of appellee's defense to the Attorney General's claim below.

Under any mode of equal protection analysis, we must first determine whether section 56 (c), which singles out some retired judges for preclusion from engaging in the legal profession, is to be examined in the bright light of strict judicial scrutiny. We are only briefly detained here, for it is clear to us that the prohibition embodied in section 56 (c)

neither impacts upon rights recognized as "fundamental" nor classifies along lines determined to be "suspect." Appellee's contention that the right "to make a living by practicing the profession in which [one] has been trained and qualified" is fundamental, for purposes of equal protection review, finds no support. *See Massachusetts Bd. of Retirement v. Murgia, supra; San Antonio School District v. Rodriguez, supra; Harper v. Lindsay,* 616 F.2d 849, 854 (5th Cir. 1980).

We accordingly consider the statutory classification before us, in determining its validity under both the federal and our State Constitutions, under that broad generality of equal protection analysis already referred to as rational basis review. "This type of inquiry involves an assessment of the enactment under attack so as to determine whether the law has a 'rational basis' which justifies the inequality springing from it." *Davidson v. Miller,* 276 Md. 54, 69, 344 A.2d 422, 432 (1975). As the decisions of the Supreme Court as well as those of this Court indicate, where vital personal interests (other than those impacted by wholly economic regulations) are substantially affected by a statutory classification, courts should not reach out and speculate as to the existence of possible justifications for the challenged enactment. The prohibition against the practice of law embodied in section 56 (c) does not represent an economic regulation of lawyers; rather, it flatly denies one the right to engage in the practice of the profession for which he is otherwise qualified. We make it plain. This is not a regulation of entry into the practice of law binding on all applicants, which traditionally has received minimal review. *E.g., Richardson v. McFadden,* 540 F.2d 744 (4th Cir. 1976), *cert. denied,* 435 U.S. 968 (1978) (testing procedure); *Younger v. Colo. State Bd. of Bar Exam'rs,* 625 F.2d 372, 376-78 (10th Cir. 1980) (limitation on retaking bar exam); *Ktsanes v. Underwood,* 467 F. Supp. 1002 (N.D. Ill. 1979) (denial of reciprocity if applicant failed state bar exam). Nor does section 56 (c) represent a regulation of how lawyers conduct their business, which has also survived equal protection attack. *E.g., Matter of Bates,* 113 Ariz. 394, 555 P.2d 640 (1976), *aff'd in part and rev'd in part*

*sub nom., Bates v. State Bar of Arizona,* 433 U.S. 350 (1977) (regulation of attorney advertising).

The right to engage in a chosen calling, once all reasonable requirements established by the legislature for the protection of the health, safety and welfare of the citizens have been complied with, has long been recognized to enjoy a preferred status. For example, in *Dasch v. Jackson,* 170 Md. 251, 183 A. 534 (1936), a statute which purported to license and regulate paperhangers in Baltimore City while failing to include paperhangers elsewhere within its coverage, could not withstand equal protection scrutiny under either the federal or this State's constitutions. Judge Offutt, speaking for this Court in *Dasch,* eloquently discussed the importance of one's occupation as it relates to the equal protection and due process guaranties:

> It is a recognized principle of American constitutional law that every man has the right to labor, to contract, to hold property, and in his own way to pursue happiness. That is liberty. It is implicit in the Declaration of Independence, in the Federal Constitution, and in the constitutions of the several states.
>
> * * *
>
> When, therefore, the application of such guaranties as are found in the Fifth and Fourteenth Amendments of the Federal Constitution, and in [Article 24] of the Maryland Declaration of Rights, is considered, it must be with due regard to the principle that the State, in the exercise of what is usually called its police power, may regulate or restrict the freedom of the individual to act, when such regulation or restraint is essential to the protection of the public safety, health, or morals. That power, however, is itself subject to the restraints imposed by constitutions which the whole people have adopted and approved as the supreme law of the land.

\* \* \*

[Thus], while the legislature may, in the proper exercise of the State's police power, classify the persons to whom a prescribed regulation found to be necessary to the public welfare may apply . . . , or determine whether certain classes of acts may be regulated . . . , nevertheless the exercise of the power must have some real and substantial relation to the public welfare . . . , and the legislature may not, under the cloak of the police power, exercise a power forbidden by the Constitution, or take away rights and privileges expressly guaranteed by it.

Among those privileges are these: That the individual shall not be deprived of his life, liberty, or property without due process of law; and that the individual is entitled to the equal protection of the law.

Property, within the meaning of that guaranty, includes the right to engage in those common occupations or callings which involve no threat to the public welfare, to exercise a choice in the selection of an occupation, and to pursue that occupation in his own way so long as he does not interfere with the rights of others.

And while the right of the legislature to regulate a business, trade, or occupation, where such regulation is required for the protection of the public health, safety, or morals . . . is settled, it may not exercise that power arbitrarily or capriciously, or in such a manner as to deprive the individual of rights, privileges, immunities, or property to which he is entitled as a matter of natural justice and common usage, except for the protection of some real and substantial public interest. *Nor, even where the object upon which the law operates is within its range, can it be exerted in such a manner as to impose upon members of a selected class burdens which are not shared by others in like cir-*

*cumstances.* [170 Md. at 262-64, 183 A. at 538-39 (citations omitted and emphasis supplied).]

Summarizing these concepts and applying them to an enactment burdening the exercise of one's occupation, our predecessors concluded:

[T]his general principle emerges with some degree of certainty, that the state may for purposes of revenue, tax any occupation or business, but that, except for revenue, it may not annex any burdensome conditions on the common callings of life or the right of the individual to engage therein, unless such regulation is required for the protection of the public health, safety, or morals, and that where justified on that ground *any classification, adopted for the purposes of the regulatory measure, must be reasonable, uniform in its operation within the class, and based upon some legitimate principle of public policy.* [*Id.* at 268, 183 A. at 541 (citations omitted and emphasis supplied).]

Other statutes unreasonably restricting the right to labor have faced similar constitutional extinction. Thus, in *Havre de Grace v. Johnson,* 143 Md. 601, 123 A. 65 (1923), a local ordinance restricting the operation of taxicabs to town residents was found constitutionally infirm. And in *Md. St. Bd. of Barber Ex. v. Kuhn,* 270 Md. 496, 312 A.2d 216 (1973), a statute which denied female cosmetologists the opportunity to perform their services on men's hair breached the equal protection guaranty. In *Schneider v. Duer,* 170 Md. 326, 336-37, 184 A. 914, 919 (1936), "[t]he right to engage in useful and productive labor [was said to be] common to all . . . and in a constitutional sense is property. . . . It lies within the protection of the twenty-[fourth] article of the Maryland Declaration of Rights and the Fourteenth Amendment of the Federal Constitution." This decision invalidated certain enactments which either "arbitrarily prevented" or "unreasonably hindered" individuals engaged in the trade of barbering. *Id.* at 337, 184 A. at 920. Likewise, this Court, in

*Bruce v. Dir., Chesapeake Bay Aff., supra,* exhibited a special sensitivity to the traditional rights of Maryland watermen to pursue their calling without being restricted to the waters of their home counties. In that case, "we fail[ed] to see just how it [was] a reasonable exercise of the police power of the State to enact a law that has the effect of depriving a waterman of Somerset County of his ability to earn a livelihood for his family. . . ," should a greater bounty of the crabs and oysters he relied upon exist in another locale within the State. 261 Md. at 603, 276 A.2d at 209.

While the U.S. Supreme Court has stated that the "right of governmental employment per se is [not] fundamental," *Massachusetts Bd. of Retirement v. Murgia, supra* at 313, there can be no doubt that it too has long recognized that the right "to engage in any of the common occupations of life" is encompassed within the concept of liberty guaranteed by the due process clause of the fourteenth amendment. *Board of Regents v. Roth,* 408 U.S. 564, 572, 92 S. Ct. 2701, 33 L. Ed. 2d 548 (1972). *See Bell v. Burson, supra* (important interest in livelihood); *In re Ruffalo,* 390 U.S. 544, 88 S. Ct. 1222, 20 L. Ed. 2d 117 (1968) (procedural due process applies to disbarment); *Schware v. Board of Bar Examiners,* 353 U.S. 232, 77 S. Ct. 752, 1 L. Ed. 2d 796 (1957) (state discrimination in refusing to allow fully qualified applicant to take bar exam violated equal protection). The Court in *Murgia,* applying "a standard less than strict scrutiny . . . [to] legislation restricting the availability of employment opportunities," upheld a state statute requiring retirement of all uniformed state police officers at age fifty. Noting that there was "no indication that [the enactment had] the effect of excluding from service so few officers . . . in fact unqualified as to render age 50 a criterion wholly unrelated to the objective of the statute," *id.* at 315-16, the Supreme Court concluded that the age classification rationally furthered the identified purpose of protecting the public by assuring the physical preparedness of its police concededly engaged in an arduous profession necessitating high physical versatility. *Id.* at 310-15. Given the obvious and significant state interest involved, the fact that the personal

interest impinged entailed government employment only, and the conceded relationship between advancing age and decreasing physical dexterity, we do not read *Murgia* to be a significant departure from the recognition that the right to pursue one's calling in life is a significant liberty interest entitled to some measure of constitutional preservation. See *Hampton v. Mow Sun Wong,* 426 U.S. 88, 102, 115-16, 96 S. Ct. 1895, 48 L. Ed. 2d 495 (1976) (ineligibility for employment in major sector of the economy of sufficient significance to be characterized as deprivation of liberty interest; wholesale deprivation of employment opportunities caused by indiscriminate agency policy violated equal protection).

Since one cannot evaluate the reasonableness of a legislative classification without comparing it to the purpose of the law, we here engage in this inquiry, recognizing that the attempt to identify the statutory objective, made mandatory by the equal protection guaranties, involves this Court in one of the more troublesome aspects of judicial review. Where, as here, important private rights are impinged by a legislative classification, we will not ride the vast range of conceivable purposes. Rather, we must evaluate either those statutory purposes which are readily discernible or a legitimate purpose that, presumably, motivated an impartial Legislature. *Cf. U.S. Railroad Retirement Bd. v. Fritz, supra* at —, [49 U.S.L.W. at 4039-40] (Stevens, J., concurring). By this we mean those purposes that are obvious from the text or legislative history of the enactment, those plausibly identified by the litigants, or those provided by some other authoritative source. The Attorney General, urging us to apply the most deferential review, conceives of several purposes for the prohibitions embodied in section 56 (c) and argues that the enactment reasonably serves each of these proffered ends. We discuss each. *See Minnesota v. Clover Leaf Creamery Company, supra* at —, [49 U.S.L.W. at 4113].

The Attorney General first asserts that this State's judicial pension system is analogous to the Social Security System in that it is designed to replace earnings lost after retirement, and, similar to the federal system, state payments are reduced if the beneficiary has outside earned

income. We fail to see any merit in the State's analogy. As we have already held in *Waldron I*, which the Attorney General appears reluctant to recognize, section 56 (c) prohibits the practice of law for compensation by a former judge who accepts his pension. By its very terms, it does not reduce benefits in proportion to the judge's outside income, nor is receipt of the pension conditioned on a judge refraining from engaging in his chosen profession. *Chairman of Board v. Waldron, supra* at 180, 401 A.2d at 175. Even if section 56 (c) did not constitute a prohibition against engaging in the practice of law, we noted long ago in *Clark v. Tawes,* 187 Md. 195, 200, 49 A.2d 463, 465 (1946), that judicial pensions are

> part of the inducement which leads competent persons to give up the greater emoluments of private employment for lesser compensation by the State. This is usually stated to be peculiarly applicable to judges who are generally able to make more in private practice than they can on the bench, and who thereby give up all chance of further increase in their estates for a fixed salary which ends when they reach a certain age.

Judicial pensions serve as both inducements to enter the judiciary and rewards for years of service; it is thus a form of deferred compensation and not a substitute earnings plan. Moreover, the structure of the judicial pension system itself belies the State's position, for no provision of the plan governing Judge Waldron reduces his pension benefits if the retired judge receives income from other employment. It is only income derived from the practice of law which is in effect forbidden by the enactment. If the judicial retirement system were truly designed as an income maintenance scheme whereby benefits were reduced in proportion to income otherwise received by the retiree, then certainly the statute would have so provided.[21]

---

21. We recognize that the pension statute seeks to prevent "double dipping" by reducing pension benefits if the retired judge accepts employment compensated by "municipal, county, state or federal funds," Md. Code (1957, 1978 Repl. Vol.), Art. 73B, § 56 (d), but this in no way limits income from private sources.

Second, the Attorney General urges that section 56 (c) "undeniably . . . saves the State money" in that seven retired jurists at present are practicing law and are not receiving pensions. We refuse to accept this type of *post hoc* rationalization of section 56 (c), for to do so would represent virtual abdication from our duty to exercise judicial review. Almost every enactment, no matter how invidious, can be justified on the grounds of fiscal restraint. For example, no one can dispute that a statute which denied the non-fundamental right of education to members of a non-suspect class of our citizens would reduce the costs of education, yet neither would anyone dispute that this action, undertaken to serve that sole purpose, would represent a manifest breach of the principles of equal protection. Undeniably, section 56 (c) can save the State a bit of money, but we will not engage in tautological equal protection analysis by deducing purpose from result.

Addressing the Attorney General's final indicated purpose for section 56 (c) we, at last, find one which appears to emerge from the enactment itself. As the Attorney General perceives it, the Legislature was attempting to prevent the appearance of, and actual, impropriety which may result from an ex-judge appearing in judicial proceedings before his former colleagues. We consider this proffered purpose because it is the most reasonable objective mentioned by the Attorney General in defense of the statute. In this context and with the assumption that this ethical problem can exist, we evaluate the enactment in light of this aim and find a classification substantially burdening the treasured right to labor that is, at once, both underinclusive and overinclusive.[22] We explain.

The statute before us fails to include many individuals within its purview that, given the proffered purpose, would need to be encompassed within its terms in order to meet that statutory objective. For example, no one could argue

---

**22.** We attribute this terminology to professors Tussman and tenBroek in their seminal work, *The Equal Protection of the Laws,* 37 Calif. L. Rev. 341 (1949).

that section 56 (c) prevents former judges from practicing law for no compensation whether or not they elect to receive their pensions, for the words of the provision expressly do not apply to this group of persons. We fail to see how, in this context, the unremunerated practice of law by former judges is different from compensated practice, justificatory of the differential treatment accorded by section 56 (c). It cannot be argued that an unrecompensed former judge is less likely to improperly use his status to his client's advantage, or that his presence in the courtroom may not comparably be affected with the taint of the appearance of impropriety. Furthermore, when a former judge elects not to receive his pension and reengages in the practice of law, which, by its very terms, section 56 (c) permits, the objective proffered by the State is similarly uneffectuated. For who can argue that the receipt of a judicial pension is a factor upon which the existence of impropriety depends? And again, no relationship can be found to exist between this statutory distinction and the purpose relating to impropriety. Further examination of the judicial pension system reveals other differential treatment which bears no rational relationship to section 56 (c)'s objective. A retired judge, in most cases, is not entitled to receive his pension until he reaches 60 years of age. Code (1957, 1978 Repl. Vol.), Art. 73B, § 56 (b). Thus, judges who do not receive their pension by virtue of their early retirement are not precluded from the practice of law, and consequently are permitted by section 56 (c) to appear before their former colleagues. Once again, certain persons are allowed to practice law under the statutory scheme when there has been no showing, and in our view could be no showing, that this group is in a different position than those burdened by the regulation.

Examining this matter from a broader perspective, if the objective be to eliminate impropriety caused by ex-governmental lawyers practicing before State bodies of which they were formerly members, this particular statute is problematic for it fails to include within the scope of its application other attorneys receiving State pensions who are just as likely as retired judges to be afflicted with the

appearance of impropriety. State government is comprised of numerous quasi-judicial boards and commissions whose members may be, and very often are, attorneys. There is no ostensible ban on the practice of law similar to that embodied in section 56 (c) applicable to these attorneys when they return to private practice following service in State government. Nor, is there any legislative ban on any State employed lawyer (whether he receives a pension or not) which prevents him from resigning his position and returning to private practice before the very governmental agency which afforded him prior employment, *e.g.,* the Workmen's Compensation Commission and the Maryland Tax Court.[23] "If all persons who are in like circumstances or affected alike are treated under the laws the same, there is no deprivation of the equal protection of the law. Conversely, a law which operates upon some persons or corporations, and not upon others like situated or circumstanced or in the same class is invalid." *Salisbury Beauty Schools v. St. Bd.,* 268 Md. 32, 60, 300 A.2d 367, 383 (1973). *Accord, Wheeler v. State,* 281 Md. 593, 603-04, 606, 380 A.2d 1052, 1058, 1060 (1977), *cert. denied,* 435 U.S. 997 (1978). Statutes, such as section 56 (c), which deny an important right to only a portion of those persons who are affected with the perceived evil the legislation seeks to eradicate, ordinarily cannot withstand constitutional challenge.

On the other hand, in relating how this statute is overinclusive, we observe that there are many attorneys who seldom, if ever, see the inside of a courtroom. A certain proportion of retired judges who desire to engage in the practice of law would be among this group. A statute having as its aim the prevention of the appearance of impropriety that may occur when an ex-judge is appearing before his former

---

**23.** We note that this practice is sharply restricted by the federal government. The Ethics in Government Act, 18 U.S.C. § 205, extends a lifetime ban on participation in particular matters in which the former government employee was "personally and substantially" involved. For two years, the former employee is forbidden to advise others so appearing or to advise in matters formally under his responsibility; and for one year, high-level former employees are completely forbidden to make any appearance before the agency advocating a position on a particular matter.

colleagues unnecessarily deprives all those retired judges who will conduct only an office practice of the right to pursue their calling in life. These retirees are included within the ban of the statute when they are not affected by the mischief sought to be remedied by it.

We wish to make it clear. The troubling aspect of this law and that which renders it an unconstitutional deprivation of equal protection, is not that the purpose sought to be attained is an improper one (assuming compliance with the separation of powers principle discussed in Part II), for this Court does not doubt that the prevention of impropriety, or the appearance of it, is a proper concern for the Legislature, and one susceptible to legislative regulation. Rather, the infirmity is that, in addressing the perceived problem, the General Assembly has drawn distinctions between persons which simply bear no relationship to the provision's objective. "The statutory discrimination is not based on differences reasonably related to the purpose of the Act in which it is found, and the [distinctions have] no relevance to the purpose for which the classification is made." *Wheeler v. State, supra* at 606, 380 A.2d at 1060. See *Eisenstadt v. Baird, supra,* 405 U.S. at 446-47; *Reed v. Reed,* 404 U.S. at 75-76. The enactment imposes a severe burden on persons who cannot be said to constitute part of the class of people afflicted with the evil the regulation attempts to remedy and, at the same time, omits from its application manifold persons who, because of their positions, ought to be subjected to the regulation if the legislative objective is in reality to be attained. We do not say that this type of unequal treatment, in and of itself, necessarily violates equal protection, for the inequality resulting from legislative line-drawing in pursuit of legitimate state interests must be weighed against the right which is deprived those who are treated differently. In this case, as we have seen, the regulation effectively denies persons the ability to pursue their chosen vocation, a right which no one can gainsay is worthy of vigorous constitutional vindication. When, as here, the burden created by the enactment denies persons a basic and important

personal right, the inequality resulting from patchwork legislative demarcations expands to constitutional dimensions and cannot be sanctioned under the equal protection guaranties. The Supreme Court of Florida reached a like result when the matter was before it in *In re The Florida Bar — Code of Judicial Conduct,* 281 So. 2d 21 (Fla. 1973).

In this regard, we find the words of Justice Jackson in his now famous concurrence in *Railway Express v. New York,* 336 U.S. 106, 112, 69 S. Ct. 463, 93 L. Ed. 533 (1949), particularly illuminating:

> Invocation of the equal protection clause . . . does not disable any governmental body from dealing with the subject at hand. It merely means that the prohibition or regulation must have a broader impact. . . . [C]ities, states and the Federal Government must exercise their powers so as not to discriminate between their inhabitants except upon some reasonable differentiation fairly related to the object of regulation. This equality is not merely abstract justice. The framers of the Constitution knew, and we should not forget today, that there is no more effective practical guaranty against arbitrary and unreasonable government than to require that the principles of law which officials would impose upon a minority must be imposed generally.

By heeding the commands of the equal protection guaranties, we cannot allow this legislative classification, which visits differential treatment on a chosen few bearing no real and substantial relation to the problem addressed by the statute, to stand.

## IV

### Conclusion

We conclude that section 56 (c) is unconstitutional as being in violation of the separation of powers principle set

out in Article 8 of the Maryland Declaration of Rights as well as of the equal protection component contained in both Article 24 of the Maryland Declaration of Rights and the fourteenth amendment to the United States Constitution.

*Decree affirmed.*
*Costs to be paid by appellants.*